2007 JUL 23 AM 11: 38

CLARENCE ...
CLERK U.S. DIST. CT.
S.D. OF FL. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-80652

CIV-MARRA

MAGISTRATE JUDGE
JOHNSON

**JAMES S. FALLER II,**

**Plaintiff,**

**COMPLAINT**

vs.

**JAMES G. MCADAMS III** (Jointly and severally as an individual and as Assistant United States Attorney)

And

**UNITED STATES DEPARTMENT OF JUSTICE (DOJ)** (Jointly and severally)

And

**FEDERAL BUREAU OF INVESTIGATION (FBI)** (Jointly and severally)

And

**ALLEN L. STIDGER** (Jointly and severally as an individual and as an FBI agent)

And

**ALBERTO GONZALES**, Individually and as United States Attorney

And

**MICHAEL BEASLEY** (Individually jointly and severally)

And

**THOMAS JOEL MANNING** (Individually jointly and severally)

And

**DOMINICK F. MAGGIO** (Individually jointly and severally)

And

**JAMES D. HOLMES** (Individually jointly and severally and as officer of LBTI)

And

**WILLIAM REEVES** (Individually jointly and severally and as officer of LBTI)

And

**LIFELINE BIOTECHNOLOGIES, INC.** (Individually jointly and severally)

And

**ROLAND (ROLAN) COLON** (Individually jointly and severally)

And

**LEO H. VERGOTE** (Individually jointly and severally)

And

**KATHLEEN M. SMITH (AKA KATHLEEN M. KILPATRICK and KATHY PARKER)** (Individually jointly and severally)

And

**ROBERT H. PARKER** (Individually jointly and severally)

And

**DONNELL JERRY DIAMOND** (Individually jointly and severally and as officer of **EVRO**)

And

**REGIS HEMPLE** (Individually jointly and severally)

And

**LEONARD NEUHAUS** (Individually jointly and severally)

And

**UNKNOWN FEDERAL AGENTS (DOJ, FBI, BOP)**

**Defendant(s)**

______________________________/

**Comes now, James Faller** and for his Complaint states as follows;

All acts complained of are within the jurisdiction of this Court.

**JURISDICTION AND VENUE**

1.) This Complaint arises from the activity of all of the Defendants to enter into a systematic pattern of willful and intentional violations and depravation(s) of the rights of the Plaintiff, Guaranteed by the Constitution of the United States of America and enforced pursuant to Title 42, Chapter 21 United states code § 1983 (relating to depravation of civil rights), § 1985 (relating to conspiracy to interfere with civil rights) and 1986 (relating to neglect to prevent violations of civil rights), and;

2.) This Complaint arises from the activity of all of the Defendants, individually, collectively, jointly and severally, involving violations of United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO).**

3.) This Complaint involves acts defined in United States Code, Title 18 United States Code § 1510 (relating to obstruction of criminal investigations), 18 United States Code § 1511 (relating to the obstruction of State and Local law enforcement), 18 United States Code § 1512 (relating to tampering with a witness, victim or informant), 18 United States Code § 1513 (relating to retaliating against a witness, victim or an informant), 18 United States Code § 1951 (relating to interstate commerce, robbery or extortion).

4.) This Court has jurisdiction pursuant to United States Code, Title 18 Chapter 96 § 1964 (a) and (c).

5.) This Court is proper venue pursuant to United States Code, Title 18 Chapter 96, § 1965 (a), (b), (c) and (d).

6.) Venue as to the defendants are appropriate under 28 U.S.C. § 1391(b) (1) (as a judicial district where any defendant resides) and 28 U.S.C. § 1391(b) (2) (a judicial district in which a substantial part of the events giving rise to the claim occurred).

7.) Plaintiff also invokes the supplemental jurisdiction of this Court to consider claims arising under Florida, Ohio, Georgia and Kentucky Statutes and the Constitution of the State of United States of America and the afore named states, as more fully set forth herein.

**PLAINTIFF**

8.) **Plaintiff James Faller** now resides in Russell County, Kentucky and operated and or was employed by various businesses, all destroyed, by the acts of the Defendants. Plaintiff has resided and or conducted business operations (or operations relating to the instant Complaint,) during the acts of the Defendants, in Fillinges France, Geneva Switzerland, Toledo Ohio, Tampa Florida, Augusta Georgia, West Palm Beach Florida and Miami Florida.

**DEFENDANT(S)**

9.) **Defendant James G. McAdams III (McAdams)** was an assistant United States Attorney working and acting at times in Palm Beach County Florida and maintained offices at United States Attorney's Office 500 S. Australian Ave, Suite

400 West Palm Beach, Florida 33401. **McAdams** acted, at numerous times, outside his role as prosecutor and became an aggravated director and conspirator in the crimes and acts complained of below, acting as the kingpin of the organization. **McAdams** also has residences in North Carolina, Georgia and Florida.

10.) Defendant **McAdams** was at times acting as a Federal Prosecutor who used his position as an officer of the Courts and law to subvert justice, control the entirety of the situations complained of and is and was acting in ways criminal in nature for personal benefit, at times using his position of law enforcement to terrorize others into assisting him in his acts.

11.) Defendant **United States Department of Justice (DOJ)** is the agency in charge, which is responsible for oversight, prosecution and prevention of the acts of several the Defendants and operates offices at 500 S. Australian Ave, Suite 400, West Palm Beach, Florida 33401.

12.) Defendant **Federal Bureau of Investigation (FBI)** is the agency in charge that is responsible for oversight, prosecution and prevention of the acts of several of the Defendants and operates offices at 500 S. Australian Ave, Suite 400, West Palm Beach, Florida 33401.

13.) Defendant **Allen L. Stidger (Stidger)** is a Special Agent with the FBI and acted as an agent of the FBI as well as acted personally for personal gain. **Stidger** is a resident of Texas. **Stidger** was the originator of the conspiracy and the predecessor king pin and director of all criminal activities prior to **McAdams**.

14.) Defendant **Stidger** acted in the interest of personal gain and disguised his activities through his position as an officer of the law, at times using his position of law enforcement to terrorize others into assisting him in his acts. **Stidger** was the original leader of the enterprise until **McAdams** took over.

15.) Defendant **Alberto Gonzales (Gonzales)** is the Presidentially appointed United States Attorney whose office is located at 950 Pennsylvania Ave., N.W. Washington DC, 20530-0001.

16.) Defendant **Gonzales** is responsible for the enforcement of laws, oversight of the other Defendants and in particular the **Office of Professional Responsibility (OPR)** who is charged with overseeing, investigation and prosecution of misconduct by **DOJ** officials.

17.) Defendant **Michael Beasley (Beasley)** is a known criminal (Fraud, Extortion, Blackmail and other violent acts, including, associations with terrorists) whose last known address is England (London proximity.)

18.) Defendant **Beasley** acted at all times to assist the other conspirators and conducted himself in such a manor necessary to obtain personal profit and damage the Plaintiff and at times was under paid contract by **LBTI** and other instant Defendants to commit the crimes and violations described later herein.

19.) Defendant **Thomas Manning (Manning)** is an attorney who is now suspended from practicing law for acts of fraud and deceit. **Manning's** office is located at 800 East Franklin Street, Centerville Ohio 45459.

20.) Defendant **Manning** acted in all ways necessary to aid and enable the other Defendants, at all times acting in the interest of personal gain and on behalf

of the others. **Manning** was acting at times at the direction of **McAdams, Stidger** and other Defendants.

21.) Defendant **Dominick F. Maggio (Maggio)** is an individual who resides at 110 North Bethany Bend Circle, Spring Texas 77382-1684. **Maggio** previously resided in Boca Raton and Tampa Florida during many of the acts complained of. **Maggio** was an employee of Lifeline Biotechnologies **(LBTI.)**

22.) Defendant **Maggio** acted at all times, in the interest of personal gain, assisting the other Defendants to deprive the plaintiff of various assets, assets and Constitutional rights. **Maggio** was tasked with assisting **LBTI** and **McAdams** to steal from and extort from Plaintiff as well as cover up the activities.

23.) Defendant **James (Jimmy) Holmes (Holmes)** is the Chief Executive Officer and major shareholder of the company known as **Lifeline Biotechnologies, Inc. (LBTI)** a publicly traded company, trading under the symbol "LBTN". **Holmes** address is 1325 Airmotive, Reno Nevada 89502-3286.

24.) Defendant **Holmes (Holmes)** acted at all times, in the interest of substantial personal gain and to assist the others in depriving the Plaintiff of substantial assets and Constitutional rights.

25.) Defendant **William H. Reeves (Reeves)** (aka William W.) acted at all times in the interest of substantial personal gain and to assist the others in depriving the Plaintiff of substantial assets and Constitutional rights. Reeves was, and or is an officer in the publicly traded company **Lifeline Biotechnologies (LBTI.)**

26.) Defendant **William H. Reeves (Reeves)** resides at 8750 NW 18th Street, Coral Springs Florida 33071-6102 and resided at 1666 Winterstone Ct. Dayton Ohio 45458-9611 and 3051 NE 47th Ct. Apt 110 Fort Lauderdale Florida 33308-5304 during many of the acts which he engaged in.

27.) Defendant **Lifeline Biotechnologies (LBTI),** a publicly trade company under the symbol **"LBTN"** is located at is 1325 Airmotive, Reno Nevada 89502-3286, as well as locations in Florida and other parts of the world.

28.) Defendant **LBTI** is the entity used by many of the Defendants to deprive the Plaintiff of substantial assets and to cover up the acts of the actors, including the obfuscation of evidence.

29.) Defendant **Rolan Colon (Colon)** is located at 940 127th Pl. Miami Florida 33182 and conducted business and relevant conduct in Ft. Lauderdale Florida, Tampa Florida, Augusta Georgia, Fillinges France, and Luxembourg. **Colon** was the director of all operations of IBSA in the United States of America and was also the owner and officer of **First Quantum Funding S.A. (FQF SA)** (Luxembourg,) **First Quantum Funding Inc. (FQF INC)** (Fort Lauderdale Florida) and First **Quantum International Inc. (FQI)** (Tampa.)

30.) Defendant **Colon** acted at all times to enable and assist the other Defendants to deprive the Plaintiff of assets and Constitutionally guaranteed civil rights. **Colon** acted in ways necessary for personal benefit.

31.) Defendant **Leo H. Vergote (LHV)** is located at 31950 Little Mack Ave. Roseville Michigan 48066-4529 and committed numerous acts to aid, assist and enable the other Defendants in depriving the Plaintiff of assets.

32.) Defendant **LHV** committed the acts against the Plaintiff in Michigan and Florida (Tampa, Boca Raton and West Palm Beach.)

33.) Defendant **Kathleen M. Smith (Smith)** resides at 107 Miller Ave., Swanton Ohio 43558 and formerly in Tampa, Crystal Beach Florida.

34.) Defendant **Smith** acted in ways necessary to facilitate and enable numerous Defendants to deprive the Plaintiff of assets and civil rights. **Smith's** acts took place in Florida (Tampa and West Palm Beach,) Ohio, Georgia and Kentucky.

35.) Defendant **Robert H. Parker (Parker)** resides at 6025 Tournament Dr., Waterville Ohio 43556-9792. Parker committed acts in Ohio, Georgia and Florida.

36.) Defendant **Parker** acted at all times to deprive the Plaintiff of assets and constitutionally guaranteed Civil rights. **Parker** acted in conjunction with various other Defendants to further the scheme to deprive Faller. **Parker's** actions enabled and assisted various other Defendants.

37.) Defendant **Donnell Jerry Diamond, Aka D. Jerry Diamond (Diamond)** is located at 14652 Villalonga Lane Charlotte North Carolina 28277-4072 and previously resided and conducted business relevant to the instant complaint in Tampa Florida and Miami Florida. **Diamond** was an officer of a publicly traded company **EVRO** in Tampa Florida. **EVRO** was used to defraud the Plaintiff under the direction of **Diamond** and **Maggio.**

38.) Defendant **Diamond** at all times acted in ways and means necessary to obtain substantial personal benefit as well as to enable and assist the other

Defendants to obtain assets and to deprive the Plaintiff of Constitutionally guaranteed civil rights.

39.) Defendant **Regis Hemple (Hemple)** is located at 32 Rue du Kiem L-8030 Strassen, Luxembourg. **Hemple** was the General Manager of **International Business Service Alliance S.A. (IBSA)** (Luxembourg) as well as an officer of various other companies including **FQI, FQF (SA) and FQF Inc**. used by various conspirators to deprive the Plaintiff of substantial assets and to further the concocted scheme to deprive the Plaintiff of Constitutionally guaranteed civil rights.

40.) Defendant **Leonard Neuhaus (Neuhaus)** resides at 5300 N. Glen Elm Dr. Peoria, Illinois and previously conducted relevant conduct in Tampa Florida and West Palm Beach Florida. **Neuhaus** was the Managing partner of the Securities trading firm Lew Lieberbaum Inc. in New York (**Lew.**)

41.) Defendant **Neuhaus** acted at all times relevant to enable numerous other Defendants to enrich themselves, and to deprive the Plaintiff of Constitutionally guaranteed Civil Rights.

**OBJECT OF THE CONSPIRACY**

42.) At all times the Defendant(s) acted, each in concert with the other, in an effort to extort money, assets and even custody of children from the Plaintiff, through intentionally wrongful acts in an egregious manner with reckless regard for the damages which their acts would cause including, loss of life, sexual assault of minor children, false imprisonment, deprivation of medical attention and extreme mental duress.

43.) The object in and of the conspiracy was to enrich themselves and their friends through acts of extortion and protection racket against the Plaintiff and others. Additional acts were engaged upon to obtain custody of children and to strip the Plaintiff of his and his family's constitutional rights.

44.) In addition, many of the acts, especially those encouraged, enabled and at times specifically contracted, were engaged in by the Defendants in attempts to cover up activities by the Defendants which were discovered by the Plaintiff, the Court and or authorities responsible for preventing and prosecuting such conduct.

45.) Many of the Defendant[s] use[d] their positions in official office to procure criminal charges against the Plaintiff to mislead the Court, stop the Plaintiff from complaining of the Defendants conduct and to prevent the Plaintiff from obtaining evidence and testimony which clearly establishes the allegations contained herein.

46.) As an added benefit to the Defendant[s], they did in fact combine, conspire and confederate to use threats of false charges, the actual filing of false charges causing false indictments, false imprisonment, perjury, acts of witness intimidation, jury tampering, threatening public officials, engaging in protecting known criminals involved in international terrorist activities to further cover up the acts which the Defendants have committed against the Plaintiff.

47.) The Defendants worked different angles, each working in concert with the other to enrich each other and protect the actions of the other from being discovered and or prosecuted.

48.) Some of the Defendants were actually paid by others, while other Defendants assisted in the protection of acts by other Defendants in exchange for immunity and or the blocking of charges by uninvolved authorities, as well as the allowed and encouraged theft of money and assets from the Plaintiff.

49.) In other acts the Defendants would engage in making threats and or actual acts of murder, rape, child abduction, disfigurement and interference with parental rights, intentionally causing the Plaintiff's minor children to be placed in harms way of known pedophiles and other harmful environments, in an effort to force the Plaintiff to succumb to the threats and acts of the Defendants.

## MANNER AND MEANS

50.) The origination of the acts of the Defendants began when the Plaintiff was a victim of an individual, Richard Adam, (ADAM) long known by the Government and many of the Defendants as a criminal who is engaged in fraud, deceit, theft, heavy weapons violations, drug trafficking and laundering money for terrorists.

51.) The Plaintiff filed a complaint against ADAM at the State of Florida Comptrollers Office, who was succeeded by the FBI and eventually Special Agent and instant Defendant **STIDGER**.

52.) At approximately the same time the Plaintiff had been funding approximately $1,000,000.00 to the publicly traded company, Defendant **LBTI** in exchange for 4,000,000 shares of stock.

53.) In time it was discovered that the stock certificates issued by LBTI, HOLMES, MAGGIO and REEVES were bogus and had never been properly or legally issued or recorded in the records of the company.

54.) At some point STIDGER began to join LBTI, REEVES, HOLMES, MANNING, MAGGIO and BEASLEY to deprive the Plaintiff of the funds as well as the Plaintiff's vehicle, records and numerous other assets, stolen by BEASLEY.

55.) After becoming aware of the apparent wealth of the Plaintiff, STIDGER and BEASLEY began a separate campaign which later came full circle to include **ALL** of the other Defendants to deprive the Plaintiff and his wife of assets through direct demands of money and assets, including BEASLEY holding the Plaintiff at gun point in PLAINTIFF'S office in Geneva Switzerland while demanding Plaintiff sign over his home located in Fillinges France.

56.) Upon the Plaintiff's refusal to succumb to the demands of STIDGER and BEASLEY, STIDGER became aware of the Plaintiff's ongoing divorce and custody battle with Defendant SMITH.

57.) Upon agreement in exchange for false testimony by SMITH on behalf of STIDGER, STIDGER appeared at an emergency custody hearing regarding the Plaintiff's children.

58.) STIDGER'S only purpose for showing up at the hearing was to fulfill his part of the deal with SMITH to highly prejudice the Family Court Judge by alleging that Plaintiff had used a false identity (Jerrett Rouge "ROUGE") and

causing the Court to return the Plaintiff's children to SMITH, who was living with a pedophile.

59.) Sixty (60) days later, Plaintiff proved that SMITH and STIDGER had lied and that the children were being victimized. The children were returned to the Plaintiff however, the four (4) year old child had been raped while in the custody of SMITH.

60.) Plaintiff filed a civil action against REEVES, HOLMES, LBTI and one other officer of LBTI for the issuance of false stock shares to the Plaintiff.

61.) This filing caused STIDGER, BEASLEY, HOLMES, MANNING, REEVES, LBTI and MAGGIO to further engage, at a much greater level, in the conduct against the Plaintiff, including murder for hire.

62.) BEASLEY is under contract by LBTI, MANNING, HOLMES, REEVES and working mainly at the direction of STIDGER and MCADAMS.

63.) STIDGER, as an agent of the FBI took the entire case against ADAM and the Plaintiff (FALLER) to a grand jury to indict them for the acts of ADAM, knowing that FALLER was a victim.

64.) Two (2) Federal; Grand Juries refused to indict FALLER.

65.) STIDGER and BEASLEY began an all out assault on the Plaintiff, including the unlawful entry into Plaintiff's home in Augusta Georgia to engage in acts necessary to manufacture false and inculpating evidence against the Plaintiff.

66.) In mid summer of 1996 STIDGER engaged in activities, including entering the home of the Plaintiff while the Plaintiff was out of the country to engage in efforts to inculpate the Plaintiff.

67.) Upon returning home, Plaintiff observed FBI agent Jerry Jones taking photos of the Plaintiff's home at which time Plaintiff chased Jones down and demanded to know what was his reason for being there.

68.) Plaintiff and Plaintiff's wife demanded that the FBI agents (Jerry Jones and Doug Fender) enter the Plaintiffs home, *"take what they want and leave the Plaintiff alone."*

69.) Jones wanted documents from the Plaintiff, which the Plaintiff gladly agreed to however, it required the Plaintiff to go to the FBI office in Augusta and make copies.

70.) Upon arrival at the Augusta Georgia FBI office, Plaintiff was confronted by STIDGER who had been in Augusta for some period of time, necessary for STIDGER to ship documents from Plaintiff's residence while Plaintiff was out of the country.

71.) When Plaintiff left his home that same day to go to Atlanta, Plaintiff observed FBI agents surveilling Plaintiff's home and tried to contact FBI Jerry Jones from Plaintiff's vehicle.

72.) Plaintiff was responded to by the SAC of the FBI office who informed Plaintiff that STIDGER and the rest of the FBI were preparing to rip the Plaintiff's home apart and that the FBI knew Plaintiff just left with all sorts of documents.

73.) Plaintiff immediately returned to his home and was greeted by five (5) agents and Plaintiff made an agreement by phone with Jones to allow the FBI to search what ever they wanted to search and to take Plaintiff's computer in exchange for not tearing the Plaintiff's home apart, as STIDGER wanted to do.

74.) In early 1997 Plaintiff was the sole shareholder of a company known as Globalnet (GLOBAL) which was engaged in the business of internet service provider to the general public throughout the entire United States.

75.) At the time, the estimated value (in the public market) of GLOBAL was in excess of $1.5 billion dollars, with very little debt.

76.) STIDGER and BEASLEY began contacting and threatening Plaintiff, Plaintiff's wife and children and Plaintiff's attorneys.

77.) STIDGER and BEASLEY proceeded to inform Plaintiff and his attorneys that they intended to due serious physical harm to the Plaintiff and his family, as well as abduct the youngest child of the Plaintiff.

78.) Shortly after the aforementioned threats, MANNING, on behalf of HOLMES, REEVES and LBTI informed the Plaintiff that he would make much of this stop if the Plaintiff would cease Plaintiff's efforts to recover the funds he had provided to LBTI, REEVES, MAGGIO and HOLMES.

79.) In early 1997 STIDGER again made an attempt to demand money from Plaintiff or *"he (STIDGER) would destroy the Plaintiff's life."*

80.) Following Plaintiff's refusal to pay up on the extortion demand from STIDGER and BEASLEY, STIDGER began a campaign in Augusta Georgia to

destroy Plaintiff and his company by contacting and meeting Plaintiff's banks and informing them that FALLER was a drug dealer and a money launderer.

81.) Working in conjunction with STIDGER, MAGGIO, HOLMES, REEVES, MANNING and others, BEASLEY began contacting all of Plaintiff's business associates and or investors and informing them that he, BEASLEY works for the FBI and the Plaintiff is a drug dealer and a money launderer. This caused Plaintiff to be isolated for attack by the instant DEFENDANTS.

82.) In May 1997, STIDGER arranged for a Savannah Georgia Grand Jury to hear yet another case against Faller, this time for allegedly having some $2,000,000.00 in a brief case and flying it around in Plaintiff's private airplane.

83.) The Savannah Grand Jury learned that the story of $2,000,000.00 was false and refused to indict Plaintiff FALLER.

84.) STIDGER, now armed with the willingness of MAGGIO to provide false testimony, since MAGGIO was about to be indicted for an unrelated fraud matter, went for a third time to the Miami Florida Federal Grand Jury and did in fact, provide false testimony, promulgation of manufactured evidence, threats to numerous witnesses and a complete and utter disregard for truth and fact, caused Faller to be indicted along with six (6) others, two of whom FALLER was a financial victim of, regarding the acts which FALLER was indicted for.

85.) On August 22nd, 1997, based on the false charges promulgated by STIDGER and others working with him, Plaintiff Faller was arrested at his home in Augusta Georgia.

86.) Although Plaintiff FALLER is constitutionally guaranteed right to reasonable bail, STIDGER appeared before a United States Magistrate Judge and provided testimony so diametrically opposed to the truth and fact of any and all matters that FALLER was denied bond for almost a year.

87.) In one false civil action, highly encouraged and coordinated by STIDGER and later managed by MCADAMS, FALLER was unknowingly using an attorney (the late William Bittner) who had been convicted and disbarred for a federal conviction.

88.) From the new evidence the notes of the Government reflect Bittner was being offered a rule 35 reduction in Bittner's sentence to allow Bittner to regain his law license in exchange for working against FALLER, all the while FALLER believing that Bittner was an attorney in good standing, defending FALLER in yet another false charge, promulgated by STIDGER and encouraged by MCADAMS.

89.) All of STIDGER'S testimony was enabled by the willing participation of all of the Defendants in various actions which they engaged in, at times together and at times separately.

90.) The key reason FALLER was denied bond was the false allegation that FALLER had $2,000,000.00 cash in a brief case.

91.) At the point of Plaintiff's false arrest and incarceration, Plaintiff's wife was 7 months pregnant.

92.) During this time, STIDGER and BEASLEY would regularly contact Plaintiff's wife and make threats to rape and murder her and to cut the baby from her stomach.

93.) These threats were always in a one two concert, designed to create the greatest level of terror in Plaintiff's family.

94.) BEASLEY would call and make the threats of rape and murder in the middle of the night, always followed by STIDGER calling and saying he could make it all stop if Plaintiff's wife *"would just tell him (STIDGER) where the money is."*

95.) At other times STIDGER and BEASLEY contacted Plaintiff's wife and children mid day to make like threats, sometimes in the presence of un-involved witnesses.

96.) To add to the effect of terror on the FALLER'S, when STIDGER or BEASLEY would call the FALLER home and reach the FALLER children, STIDGER and or BEASLEY would make various threats, including *"we know where your little sister goes to school and we know where she gets off the bus."*

97.) During the ten and one half (10 ½) months Plaintiff was held on the false charges and allegations, the false testimony of STIDGER was so effective that FALLER was denied even a bond hearing, all the way through an 11th Circuit Court of Appeals ruling.

98.) In or about April 1998, Faller wrote to the Court and alleged incredulous acts by STIDGER and others acting in concert with STIDGER, including the threats and the fact that STIDGER had directly caused a sexual assault on one of FALLER'S children.

99.) Following six (6) days of hearings with MCADAMS now controlling the case, both MCADAMS and STIDGER promulgated all sorts of knowingly false

allegations and false offers of proof including, the introduction of FALLER'S computer, seized by the FBI in Augusta and turned over to STIDGER almost two (2) years prior.

100.) The computer now contained all sorts of incriminating documents which later were discovered to be the same documents shipped from FALLER'S home by STIDGER while FALLER was not at home. The documents were signed by STIDGER.

101.) During the six (6) days of hearings, MCADAMS asked for, and was granted several continuances to obtain interviews of persons in Europe who allegedly could inculpate FALLER.

102.) One of those witnesses was a person named Jacques Mosimann who was paid by allowance and allowed to engage in crimes against FALLER by and from STIDGER, BEASLEY, REEVES, HOLMES, MANNING and MCADAMS.

103.) To assist MANNING, BEASLEY, HOLMES, REEVES, MAGGIO and LBTI in defrauding FALLER, MCADAMS continued to work with, assist with evidence, including using these other Defendants to hide evidence from FALLER and when necessary, to make timing of arrests and charges of FALLER to prevent FALLER from continuing to prosecute his claim against them in Ohio.

104.) These arrests, along with the intentional withholding of some 50,000+ documents, accompanied by the knowingly false testimony of BEASLEY'S employees, allowed a judgment to be gained against FALLER and his wife.

105.) This judgment will be attacked pursuant to a 60 (b) attack for fraud on the Court in Ohio, a fraud much like the fraud engaged in by MANNIING which has caused him to be suspended for two (2) years from the practice of law.

106.) On the final day of the evidentiary hearings to procure the bond and release of FALLER, STIDGER got caught up in his false testimony, at which time the presiding Magistrate Judge demanded to know if MCADAMS knew what they were promulgating was patently false. MCADAMS, after much resistance admitted that the Government knew for over ten (10) months that the allegations the Government, through STIDGER and MCADAMS were false.

107.) Plaintiff was released as a result of the admission by MCADAMS, after being held for ten and one half (10 ½) months on patently false allegations.

108.) Knowing that he (MCADAMS) was in dire straights and the probable subject to sanctions, disbarment and possible criminal charges, in or about July 1998 MCADAMS sent a written un-solicited plea offer to Plaintiff FALLER which made clear, that should FALLER refuse the offer that FALLER'S new wife would be indicted for her testimony at the May 1998 hearings. FALLER and his wife refused.

109.) Following FALLER'S adamant refusal to plea, especially being the largest victim, MCADAMS, individually and holding himself out as an officer of the United States Department of Justice official, engaged on a literal world tour and became the lead investigator in the charges against the instant Plaintiff, et al.

110.) It was at this point that MCADAMS took full control of all activities being conducted against FALLER and MCADAMS' conduct, along with many of the other instant Defendants, continues as of the writing of this complaint.

111.) MCADAMS traveled to numerous countries including Switzerland, Luxembourg, France and other areas.

112.) MCADAMS efforts were not to seek justice, but to personally make sure that FALLER and others could not access the enormous amount of evidence which conclusively proved that FALLER was and is in fact the single largest victim of the charges which FALLER was charged with.

113.) MCADAMS would selectively use his position as an Assistant United States Attorney and at other times MCADAMS would engage in personal promises which would have other wise be criminal in nature and disallowed by the DOJ.

114.) In MCADAMS' travels, he would engage in whatever means necessary to continue the scam being perpetrated against FALLER and others including, but not limited to, fraud, witness intimidation, promises and or provisions of wealth, immunity for criminal acts, even to the point of allowing a known terrorist to remain free and unrestricted in the United States of America and for that terrorist to open an aviation company in South Florida, shortly before being sentenced and released, without restriction.

115.) In May of 2000, instant Plaintiff FALLER went to trial, knowing full well that all of the evidence which would prove his being a victim remained unavailable to him (FALLER).

116.) During trial, Defendants and all of the Government witnesses knew FALLER'S defense was empty of any proof to disprove any testimony against FALLER that the witnesses wished to provide, because MCADAMS had all of the evidence hidden, destroyed and or being withheld by others.

117.) Defendants MCADAMS, STIDGER, MAGGIO, COLON, VERGOTE, DIAMOND, HEMPLE and NEUHAUS all knowingly provided patently false testimony against FALLER in exchange for various items including, immunity, reduced sentence, money and or assets already stolen from FALLER and even political influence peddling in other countries and in other matters.

118.) Some Defendants such as BEASLEY, HOLMES, REEVES, SMITH and PARKER gave knowingly false interviews and testimony regarding matters of significant importance to members of the FBI and DOJ to help the others cover up their conduct and to set up agents allowing them to testify to matters coming across as credible, first hand interviewers of the events and witnesses, despite the interview being full of false information.

119.) Despite FALLER seeking the evidence through the Courts and begging the Government and MCADAMS for it, the Government and MCADAMS continued to deny any knowledge of, or existence of evidence which was exculpatory and specifically denied that they (the Government or MCADAMS) had the documentation which FALLER and the person who went to trial with FALLER (Barbara Murray) [U.S.A vs. ADAM et al., 97-CR-6063].

120.) Following trial, the presiding Judge did not buy into the case which FALLER was convicted of and expressed substantial concerns for the prosecution

(MCADAMS) and "the playing of games" with evidence. The trial Court refused to incarcerate FALLER despite demands of MCADAMS and further false allegations that FALLER had eleven (11) million dollars offshore.

121.) As a result of a horrific injustice, FALLER and his local Attorney, Angela Morelock (Morelock) sent a detailed package to every member of congress as well as all United States Senators.

122.) Senator Max Cleland and late Congressman Charlie Norwood demanded an investigation.

123.) On August 15th, 2000 OPR, FBI agent William Woerner (WOERNER) and Agent Lorie Taylor (TAYLOR) met with FALLER, FALLER'S wife, attorney MORELOCK and FALLER'S trial lawyer, Craig Gillen (GILLEN).

124.) After all of the evidence (at that time) was presented to WOERNER and TAYLOR, TAYLOR and WOERNER stated *"This is a terrible injustice, why hasn't the Judge done something about it?"*

125.) On August 24th, 2000 FALLER placed his then two and one half (2 ½) year old son in his vehicle at home in Augusta Georgia and walked to the end of the driveway to be jumped by some dozen or more agents, heavily armed and wearing flak gear.

126.) The alleged reason was that FALLER had allegedly tried to tamper with a witness. Additionally, FALLER'S attorney MORELOCK had a detective photograph STIDGER to assist in identifying STIDGER as the person who shipped material from FALLER'S home in FALLER'S absence.

127.) On October 15th, 2000 FALLER was taken, in chains, to be sentenced for a crime he is the largest victim of. The Court refused.

128.) The same night FALLER was jumped and taken to jail, MORELOCK and her husband, Dr. Brooks Morelock were enroute from Tennessee to Georgia to assist FALLER with the arrest.

129.) An attempt was made on the lives of the MORELOCK'S by what the court in the local district where the incident took place informed MORELOCK involved Federal agents.

130.) When MORELOCK testified to this, MCADAMS first told the Court that Dr. Morelock was being investigated for prescription fraud and when that did not work, MCADAMS told the Court that Dr. Morelock told his commanding officer in Bosnia the incident never happened.

131.) Dr. Morelock signed a three page affirmation before being deployed to Bosnia. When the affidavit was presented MCADAMS was laughed out of the court room.

132.) FALLER was released for a second time after being held yet another two and one half (2 ½) months.

133.) When MCADAMS efforts failed to keep FALLER in prison, MCADAMS went to FALLER'S bondsman and asked the bondsman to recall the bond. ($500,000 corporate surety).

134.) When a hearing was held the Court reduced the bond and FALLER was allowed to remain free.

135.) During the next few months FALLER'S assertion that the Government was withholding thousands of documents showing FALLER as a victim began to prove true as a few materials slipped from MCADAMS hands.

136.) The Court ordered hearings which lasted several days in December 2001 and January 2002.

137.) During the hearings STIDGER engaged in a pattern of conduct consistent with that which he was famous for, threatening the FALLER'S and especially their children.

138.) In one event, FALLER'S daughters, the late Mary Dixon and Sarah Faller were at the hotel which the FALLER'S were staying, waiting to testify against STIDGER.

139.) STIDGER began calling the room and threatened the FALLER children.

140.) Again, during the hearings, STIDGER threatened FALLER'S wife at the door of the court room.

141.) When one witness, Joseph Gergle pointed directly at MCADAMS and stated that he, MCADAMS had threatened him during trial, Gergle was threatened with prosecution, causing Gergle to need an attorney to complete his testimony.

142.) At about this time (January 2002) MCADAMS began a second series of attacks and influences to stop FALLER.

143.) MCADAMS, in an effort to have FALLER'S bond revoked again began contacting FALLER'S employees and landlord, encouraging them to have

FALLER charged with anything they could come up with, which eventually perfected false charges against FALLER in Kentucky.

144.) This effort resulted in the person charging FALLER being indicted for perjury and criminal trespass into FALLER'S home.

145.) The only items taken were some tools and a box of documents. These documents showed up in MCADAMS' personal file, described more fully later herein.

146.) Again, FALLER went to sentencing and the Court refused to sentence FALLER while FALLER filed more Brady material discovered that was withheld by MCADAMS.

147.) Finally, on February 14th, 2003, FALLER and Murray were sentenced while the Court stated its great concern for the validity of the case against them; FALLER and Murray remained free on bond, pending appeal.

148.) In July of 2003, FALLER was notified that the 50,000 + documents he (FALLER) had been seeking suddenly appeared in the Government's files.

149.) MCADAMS became aware that FALLER was noticed of the location of the documents by lead Defendant ADAM'S attorney.

150.) MCADAMS again began a deluge of efforts to commit crimes against FALLER and to concoct false charges against FALLER to prevent FALLER from obtaining copies of the documents which proved FALLER is in fact the single largest victim in the case charged against him (FALLER) and that MCADAMS knew it all along.

151.) With the impending threat that FALLER was about to obtain the documents, MCADAMS negotiated the deal of the century to release ADAM.

152.) At the time ADAM was released without restriction, ADAM had pending charges in Europe for laundering money for the Turkish Terrorist organization, known as the PKK, was now convicted of several felonies in the United States and ADAM was not, and is not a Citizen of the United States.

153.) Additionally, MCADAMS knew that ADAM had numerous convictions in Canada, including the sale of heavy weapons, drug trafficking and fraud.

154.) Despite not being a citizen of the United States, MCADAMS threw into the plea deal that ADAM would not be deported, especially since MCADAMS had ADAM try to recover the frozen documents to prevent FALLER from obtaining them.

155.) MCADAMS moved heaven and earth to have FALLER incarcerated any way he could because FALLER was about to prove, through obtaining the hidden material, beyond any argument, that the entirety of the case which he (FALLER) was charged and convicted of, was an absolute ruse, leaving not one scintilla of allegation against FALLER, nor one syllable of testimony to be anything less than a script conceived of evil fraud, by MCADAMS and the instant Defendants.

156.) In September of 2003, MCADAMS concocted a scheme to have FALLER and his wife falsely charged in Kentucky using perjury before a Kentucky Grand Jury.

157.) One witness testified that she was owed by FALLER, some $30,000.00 pay for two weeks work. When she claimed to have worked for FALLER it was

discovered that she was actually in a mental institution in Oklahoma and she never worked for FALLER, ever. All of the complaining witnesses are currently Defending RICO charges in Kentucky for the acts against FALLER.

158.) Before MCADAMS could mobilize FALLER'S bond revocation, FALLER traveled to the offices of ADAM'S attorney, Maria Elana-Perez on October 13th, 2003 and was allowed to view the evidence but not copy it or take any of the evidence.

159.) At this time, Adam was still in custody.

160.) On December 9th, 2003 FALLER'S bond was revoked.

161.) When FALLER arrived in the Miami FEDERAL Detention Center, MCADAMS knew FALLER would seek to prove he (FALLER) was a victim by obtaining the new material.

162.) MCADAMS, working with unknown BOP officials and an inmate, Wayne Selogy, who was known to pay money for information on cases which he (Selogy) could provide false testimony to obtain a reduced sentence, concocted a story that FALLER was planning harm to MCADAMS.

163.) As a result, FALLER was placed in the Special Housing Unit (SHU), which is usually reserved for violent inmates or inmates who are political status.

164.) This placement in the SHU prevented FALLER from any contact with his family or then lawyers and also created a situation where FALLER was refused medical attention for several months.

165.) The placement of FALLER in the SHU led MCADAMS to believe FALLER could not obtain the newly discovered Brady material. MCADAMS was wrong.

166.) Upon release of FALLER from the SHU, FALLER filed a *pro se* motion requesting an order for immediate medical attention and an order freezing the new Brady material and to be released on bond because the entire case in Kentucky was also a ruse.

167.) The orders to preserve the evidence and provide medical attention were Granted however, the Magistrate denied FALLER'S motion for bond because of the Kentucky indictments.

168.) On July 21st, 2004, FALLER was released and had served the entire two (2) year sentence for a crime FALLER is the largest victim of.

169.) FALLER immediately moved to obtain the new evidence, over substantial and violent objection of MCADAMS.

170.) Shortly after FALLER'S return home, FALLER received a phone call from BEASLEY threatening that FALLER "had better leave it be, or it may all end real fast."

171.) The new material led FALLER to a plethora of additional new material as recently as July 2007, all showing FALLER was the largest victim of the case charged against him and that the instant Defendants all organized a scheme to prevent FALLER from obtaining the new Brady material for personal gain.

172.) The new evidence demonstrates that the witnesses against FALLER were in several categories and many in more than two.

173.) Said new evidence also conclusively demonstrates that the entirety of the case presented against FALLER and respectfully Murray was a patent falsehood, all orchestrated by MCADAMS and STIDGER, and made possible by their alliance with the other instant Defendants.

**DEFENDANT CATAGORIES**

174.) Defendants STIDGER, MCADAMS, DOJ, FBI, GONZALES, and UNKNOWN DOJ, FBI and BOP engaged in a cover up, including stepping outside of their respective offices, when necessary and at other times using their offices to encourage, enable and allow crimes against FALLER and at other times these Defendants simply turned their back on the crimes being committed against FALLER and his family to allow the ends to justify the means.

175.) Defendants BEASLEY, MANNING, MAGGIO, HOLMES, REEVES, LBTI, VERGOTE, DIAMOND and COLON all obtained profit, and or were promised by MCADAMS and or STIDGER from FALLER personal gain, including monetary and property from FALLER and his wife in exchange for assisting the other instant Defendants in the conspiracy.

176.) Defendants COLON, VERGOTE, DIAMOND, HEMPLE, and NEUHAUS were all motivated by MCADAMS, STIDGER and others in exchange for immunity in exchange for knowingly false testimony and interviews.

177.) Defendant SMITH was motivated to remain silent and hide evidence in matters she could have assisted FALLER in exchange for financial gain and the promised interference by STIDGER, using his position as an FBI agent to

interfere with family Court hearings regarding custodial arrangements of the FALLER children to assist SMITH in obtaining custody of the marital children as well as substantial financial support as a result.

178.) Defendant PARKER was motivated by sexual favors from SMITH as well as promises of financial gain by STIDGER and MCADAMS.

179.) Defendants GONZALES, UNKNOWN DOJ, FBI, and BOP engaged in a pattern of activity to assist MCADAMS, STIDGER and other defendants to deprive the Plaintiff of assets, liberty and constitutionally guaranteed civil rights and willingly refused to investigate and prosecute any and all of the instant Defendants when the acts of the actors was brought to the attention of the FBI, DOJ and those charged with oversight of all of the within matters.

## OVERT ACTS

180.) **All Defendants** engaged in a conspiracy which is continuing and ongoing as an Enterprise, in violation of the **RICO** statutes of the United States of America.

181.) **All Defendants** engaged in a conspiracy which is continuing and ongoing to violate the Civil Rights of the Plaintiff.

182.) **All Defendants** at all times worked, each in concert with the other, sometimes together and sometimes separately to engage in the various crimes complained of, each enabling or assisting the other. But for the willing cooperation of **ALL Defendants**, the acts complained of would not have been possible or would have been greatly reduced.

183.) Defendant **Stidger** acted as lead conspirator and king pin of the enterprise by engaging all of the other Defendants until 1998 when the lead position was taken over by Defendant **McAdams**.

184.) Defendant **Stidger, McAdams, Beasley, Holmes, Reeves, Maggio and LBTI** engaged in a continuing conspiracy to cause immanent death and injury to Plaintiff and others when by collectively hiring and directing Defendant **Beasley** to carry out all efforts necessary to terminate the life of Plaintiff.

185.) Defendant **Beasley** attempted to murder the Plaintiff at gun point in Geneva Switzerland to further the acts of the other Defendants.

186.) Defendant **McAdams** directed numerous criminal acts against the Plaintiff from 1998 until the present date, including the coordination of efforts to cause the death and serious injury to the Plaintiff and others.

187.) Defendant **McAdams** did in fact direct, combine, conspire and confederate with Defendants **Stidger, Beasley, Holmes, Reeves, Maggio and LBTI** to further the criminal acts, including egregious bodily harm, extortion against the Plaintiff and his family from 1998 until the present time.

188.) Defendant **Stidger** engaged in a continuing pattern of terror and inflict same upon the Plaintiff and his family by continually causing and or directly engaging in threats of death and other terrifying threats to the Plaintiff and his family to promote the scheme complained of within.

189.) To further the scheme and to knowingly deprive the Plaintiff of his constitutionally guaranteed rights, Defendant **Stidger** unlawfully entered the

home of the Plaintiff while the Plaintiff was not at the home and was unaware of the act of **Stidger**.

190.) To further the scheme and to knowingly deprive the Plaintiff of his constitutionally guaranteed rights, Defendant **Beasley** unlawfully entered the home of the Plaintiff while the Plaintiff was not at the home and was unaware of the act of **Beasley**.

191.) To further the scheme and to knowingly deprive the Plaintiff of his constitutionally guaranteed rights, Defendant **Beasley** stole the 1994 850 BMW as well as numerous documents, records and assets of the Plaintiff.

192.) To further the scheme and to knowingly deprive the Plaintiff of his constitutionally guaranteed rights, Defendant **Manning** directed the activities of **Beasley,** including traveling to Germany to hire **Beasley**.

193.) To further the scheme and to knowingly deprive the Plaintiff of his constitutionally guaranteed rights, Defendant **Manning** illegally concealed material evidence which was critical to the Plaintiff.

194.) To further the scheme and to knowingly deprive the Plaintiff of his constitutionally guaranteed rights, Defendant **Holmes, Reeves and LBTI** engaged and paid for the criminal services of **Beasley**.

195.) To further the scheme and to knowingly deprive the Plaintiff of his constitutionally guaranteed rights, Defendant **Maggio** manufactured evidence and created false official documents to aid in the thefts and extortions of the Plaintiff.

196.) To further the scheme and to knowingly deprive the Plaintiff of his constitutionally guaranteed rights, Defendants **Holmes, Reeves, Maggio and LBTI** issued knowingly false documents and stock certificates to the Plaintiff.

197.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendant **Stidger** committed perjury and made false declarations before various Grand Juries and at various hearings.

198.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendant **McAdams** suborned perjury of numerous witnesses, including but not limited to Defendants, **Maggio, Stidger, Colon, Vergote, Diamond, Hemple and Neuhaus.**

199.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendant **McAdams** knowingly made numerous false declarations during innumerable hearings, trial and other official committees and agencies.

200.) To aid in the constitutional violations and cover up and enablement of the various, systematic crimes being committed against the Plaintiff, Defendant **Maggio** committed perjury before trials, hearings and Grand Jury.

201.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendant Colon engaged in limitless perjury before various courts, under oath.

202.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendant Smith

engaged in perjury and subornation of perjury before various hearings, trials and other official events where testimony would be under oath.

203.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendant **Parker** committed various acts of fraud against the Plaintiff.

204.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendant **Parker** provided knowingly false statements and made false declarations to various law enforcement and officials.

205.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **Stidger, Beasley, Manning, Holmes, Reeves, Maggio, LBTI, Vergote, Smith and Parker** attempted to extort money and other assets from the Plaintiff.

206.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendant **Hemple** committed perjury on behalf of the others.

207.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants, **McAdams, Beasley, Holmes, Reeves, Manning, Maggio, Smith and Colon** destroyed, altered and falsified records to be used in a Federal investigation.

208.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams, Stidger, Beasley, Manning, Maggio, Holmes, Reeves, LBTI, Vergote, Smith,**

**Parker, Neuhaus and unknown FBI and BOP agents** tampered with numerous witnesses.

209.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams, Stidger, Beasley, Manning, Maggio, Holmes, Reeves, LBTI, Vergote, Smith, Parker, Neuhaus and unknown FBI and BOP agents** retaliated against both witnesses and victims.

210.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, **ALL Defendants** obstructed the investigation of the crimes being committed against the Plaintiff.

211.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams, Stidger, Beasley, Manning, Maggio, Holmes, Reeves, LBTI, Colon, Vergote, Smith, Parker, Hemple, Neuhaus and unknown FBI and BOP agents** obstructed the various proceedings.

212.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams, Stidger and unknown FBI, DOJ and BOP agents** acted in every way possible to deprive the Plaintiff of his constitutionally guaranteed civil rights under the color of law.

213.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams, Stidger and unknown FBI, DOJ and BOP agents** acted in every way possible

to deprive the Plaintiff of his constitutionally guaranteed civil rights under the color of law.

214.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams, Stidger, Beasley, Manning, Maggio, Holmes, Reeves, LBTI, Colon, Vergote, Smith, Parker, Hemple, Neuhaus and unknown FBI and BOP agents** engaged in blackmail of the Plaintiff.

215.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams, Stidger and unknown FBI and BOP agents** attempted to extort the Plaintiff.

216.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams, Stidger and unknown FBI and BOP agents** falsely imprisoned the Plaintiff.

217.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **McAdams** engaged in materially supporting acts of terrorism in his activities with Richard Adam.

218.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **Stidger, Beasley, Manning, Holmes, Reeves, Maggio, LBTI, Smith and Diamond** obtained proceeds from extortion of the Plaintiff.

219.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **DOJ, FBI and Gonzales** failed to prevent the acts complained of in the instant Complaint.

220.) To aid in the constitutional violations and cover up of the various, systematic crimes being committed against the Plaintiff, Defendants **DOJ, FBI and Gonzales** acted to cover up the activities of the others.

**Count I**

221.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** against Intervening Plaintiff, **James S. Faller II**.

**Count II**

222.) On or about 1994 through the present date **Defendants McAdams, DOJ, FBI, Stidger and Gonzales** did in fact combine, conspire and confederate to violate the Civil rights of **Plaintiff James S. Faller II** United States Code, Title 42 United States Code Section 1983.

**Count III**

223.) On or about 1994 through the present date **ALL Defendants** did in fact combine, conspire and confederate to violate the Civil rights of **Plaintiff James S. Faller II** United States Code, Title 42 United States Code Section 1985.

## Count IV

224.) On or about 1994 through the present date **Defendants McAdams, DOJ, FBI, Stidger and Gonzales** did in fact combine, conspire and confederate **to and failed in their duty and neglected to prevent** the criminal acts listed herein against the **Plaintiff James S. Faller II**. In violation of Civil rights of **Plaintiff James S. Faller II** United States Code, Title 42 United States Code Section 1986.

## Count V

225.) At all times, **Defendants Beasley, Holmes, Manning, Reeves, LBTI, Stidger, McAdams and Maggio** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** against Plaintiff, **James S. Faller II** by engaging in a murder for hire scheme in violation of United States Code, Title 18 United States Code 95 § 1958 **(Use of interstate commerce facilities in the commission of** murder-**for**-hire.**)**

## Count VI

226.) At all times, **Defendants Stidger and McAdams** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** against Plaintiff, **James S. Faller II** by engaging in extortion in violation of United States Code, Title 18 United States Code 41 § 872 **(Extortion by officers or employees of the United States.)**

**Count VII**

227.) At all times, **Defendants Stidger, McAdams, Beasley, Holmes, Manning, Reeves, Maggio, Smith and Parker** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (relating to depravation of civil rights), § 1985 (**relating to conspiracy to interfere with civil rights**) against Plaintiff, **James S. Faller II** by engaging in **Blackmail/extortion** in violation of United States Code, Title 18 United States Code 41 § 873 (**Blackmail.**)

**Count VIII**

228.) At all times, **Defendants Stidger, Beasley, Holmes, Manning, Reeves, Maggio, Smith and Parker** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (relating to depravation of civil rights), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by receiving proceeds from extortion in violation of United States Code, Title 18 United States Code 41 § 880 **(Receiving proceeds from extortion)**

**Count IX**

229.) At all times, **Defendants Stidger and McAdams** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States

Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (relating to depravation of civil rights), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by depriving the Plaintiff of his civil rights under the color of law in violation of Title 18, Chapter 13 United states code § 242 **(Deprivation of civil rights under the color of law.)**

**Count X**

230.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by Obstruction of proceedings before departments, agencies and committees in violation of United States Code, Title 18 United States Code 73 § 1505 (**Obstruction of proceedings before departments, agencies and committees.**)

**Count XI**

231.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT**

**ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by Obstruction of criminal investigations in violation of United States Code, Title 18 United States Code 73 § 1510 (**Obstruction of criminal investigations.**)

**Count XII**

232.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by Tampering with a witness and Victim in violation of United States Code, Title 18 United States Code 73 § 1512 (**Tampering with a witness and Victim.**)

**Count XIII**

233.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by Retaliating

against a witness and Victim in violation of United States Code, Title 18 United States Code 73 § 1513 (**Retaliating against a witness and Victim.**)

## Count XIV

234.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by destruction, alteration and falsification of records in a Federal investigation in violation of United States Code, Title 18 United States Code 73 § 1519 (**destruction, alteration and falsification of records in a Federal investigation.**)

## Count XV

235.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by engaging in Perjury and false declarations in violation of United States Code, Title 18 United States Code 79 § 1621 (**Perjury and false declarations**)

## Count XVI

236.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by Suborning Perjury and false declarations in violation of United States Code, Title 18 United States Code 79 § 1622 **(Subornation of Perjury and false declarations)**

## Count XVII

237.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by making false declarations before a Grand Jury and Court in violation of United States Code, Title 18 United States Code 79 § 1623 **(Making false declarations before a Grand Jury and Court.)**

## Count XVIII

238.) At all times, **Defendant McAdams** did in fact combine, conspire and confederate with known and unknown individuals in an effort to further his

violations of the rights of the Plaintiff in violation of Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** and to cover up his activities and culpability in the instant matters by providing material support to International Terrorism in violation of United States Code Title 18 United States Code 113B § 2339A and 2339B.

**Count XIX**

239.) At all times, **ALL Defendants** did in fact combine, conspire and confederate to violate the United States Code, Title 18 United States Code 96, § 1962 (a), (b), (c) and (d) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)** and Title 42, Chapter 21 United states code § 1983 (**relating to depravation of civil rights**), § 1985 (**relating to conspiracy to interfere with civil rights**) Against Plaintiff, **James S. Faller II** by causing the false imprisonment of the Plaintiff numerous times in various jurisdiction.

**ATTACHED TO THIS COMPLAINT ARE VARIOUS AFFIRMATIONS TO SUPPORT THE MATTERS COMPLAINED OF WITHIN.**

**PRAYER**

**NOW THEREFORE**, Plaintiff prays that a judgment and a decree be entered against all Defendants, Jointly and Severally as follows;

1.) An immediate preliminary injunction prohibiting any of the Defendants from engaging in any further activity, either directly complained of or similar to that which is complained of in the instant complaint;

2.) Adjudging or decreeing that each of the Defendant[s] acted unlawfully as alleged and that the respective Plaintiff as to such Counts was injured as alleged;

3.) Awarding the Plaintiff against the Defendant[s] a judgment in all counts that the conduct of the Defendant[s] are facially criminal in application to Plaintiff;

4.) Awarding the Plaintiff $3,000,000,000.00 dollars in damages from lost property, assets, including companies previously owned and destroyed by the Defendants or those assets which were stolen, scammed or wrongfully obtained from the Plaintiff by the Defendants to date and any future losses and associated costs from the Defendant[s], jointly and severally;

5.) Awarding a permanent injunction in favor of the Intervening Plaintiff against the Defendant[s] prohibiting the Defendant[s] directly and through co-conspirators from any further criminal conduct against the Plaintiff, his Family and Associates;

6.) Awarding the Plaintiff punitive damages in the amount of $100,000,000.00 against the Defendant[s], jointly and severally;

7.) Awarding the Plaintiff $2,000,000.00 for medical suffering, against the Defendants, Jointly and Severally;

8.) Awarding the Plaintiff $5,000,000.00 for the time which the Plaintiff was falsely imprisoned for 636 days plus being under government control for over ten (10) years against the Defendants, Jointly and Severally;

9.) Awarding the Plaintiff damages for emotional duress in the amount of $100,000,000.00 against the Defendants, jointly and severally;

10.) Awarding the Plaintiff $100,000.00 in medical costs directly resulting from the conduct of the Defendants, Jointly and Severally;

11.) Awarding the Plaintiff his fees and costs, including legal and attorney fees against the Defendant[s], jointly and severally for the costs of Defending the false actions (in numerous matters) brought against the Plaintiff as well as any and all associated costs in bringing the instant matter;

12.) Awarding the Plaintiff future earnings loss from the Defendants, Jointly and severally in an amount of $5,000,000.00

13.) Awarding the Plaintiff pre-judgment interest as appropriate and post-judgment interest against all Defendant[s], jointly and severally;

14.) Awarding the Plaintiff such other and further relief as the Court and Jury may deem just and proper.

**Jury Demand**

Plaintiff hereby demands a trial by jury of all issues properly triable to a jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**I James S. Faller II, the Plaintiff,** do hereby certify that the entire contents of this complaint are true and accurate to the best of my belief and knowledge as of the writing of this complaint.

James S. Faller II, Plaintiff
P.O. Box 2395
Russell Springs, Kentucky 42642
(270) 866-6911
(270) 866-5141 Fax

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 97-6063-CR-RYSKAMP

UNITED STATES OF AMERICA,

Plaintiff,

-vs-

JAMES S. FALLER, II,

Defendant.
_______________________________/

COPY

## AFFIDAVIT OF JEANINE METTEL

STATE OF GEORGIA )
) SS:
COUNTY OF RICHMOND )

JEANINE METTEL, being duly sworn, deposes and says:

1. I am a former employee of Global Net, Inc., which was an Internet service which JAMES FALLER ("FALLER"), was working with prior to his arrest.

2. On Sunday, April 28, 1997 at about 8:00 p.m., I was at the AdamsMark Hotel lobby in Daytona Beach, Florida, with FALLER and BOB STUHL, who were in Daytona Beach to work at the Global net location there. FALLER and STUHL were concerned about a possible leak within the company by former employees. Specifically, Barry Weinstein ("Weinstein"), the individual who had sold the internet business to FALLER, had told Faller that he "wanted to take back the business." It was believed that Weinstein might succeed if the Company's attempts to raise capital were to fail. FALLER, SUHL and I discussed the danger of employees "leaking" to Weinstein certain information learned from overhearing FALLER's conversations with investors. Accordingly, FALLER, STUHL and I, fabricated a story to flush out whether confidential information was being leaked, especially to Weinstein. This fabricated story was about $2 million in cash in a briefcase brought by COLON from Miami. Subsequently, I leaked the story to Julie Izquierdo at Global Net in Augusta. While at the Daytona office with COLON, we discussed his trip to Nicaragua and he told me that he was there to develop some Internet business with the Nicaraguan government. I did not know the full details and it was only a casual discussion. Interestingly, our hunch was apparently correct as I was later questioned by Brett Berlin, Weinstein's best friend who worked at Globalnet, about the fictitious $2 million.

3. On July 2, 1997, I was contacted by two FBI agents, one a white male named Terry and the other an unidentified black FBI agent. After some questioning about Global Net, Terry asked me, "Does $2 million ring a bell?." It was at this point that I realized that the fabricated story to the employees had also been leaked to the FBI agents. I admitted to both FBI agents that the story was completely fabricated, even mentioning to them that I had the brief case that the money had supposedly been transported in and made it available to them for any chemical testing the FBI wanted to conduct to see if money had ever been in it. I advised them that only office supplies were ever in the briefcase and that there was never any large amount of cash carried in the briefcase at any time. Terry also asked me, "What was the reason for Rolan's trip to Nicaragua?" I told the agents what COLON had told me. The last thing the FBI agents mentioned to me was how they were obligated to "investigate every lead" about money coming from foreign countries. When I went to the grand jury to testify, I expected to be questioned about the briefcase but never was. My impression after the FBI agents left was that they had realized that there was absolutely no truth to the story about the two million dollars coming from Nicaragua.

FURTHER AFFIANT SAYETH NOT.

Jeanine Mettel
JEANINE METTEL

STATE OF GEORGIA )
)SS:
COUNTY OF Richmond

The foregoing instrument was acknowledged before me this 28th day of Apr, 1998, by Jeanine Mettel who is personally known to me or who has presented drivers license as identification, and did take an oath.

DATED this 28th day of Apr, 1998.

Vivian Diane Gray
NOTARY PUBLIC, State of Georgia

My Commission Expires:

Notary Public Richmond County, Georgia
My Commission Expires July 7, 2000

H:\LIBRARY\1634\Pleading\mettel affidavit.wpd

COPY

MIC

Myers Investigative Consultants

13

**ATTORNEY WORK PRODUCT**

**INTERVIEW REPORT**

| | |
|---|---|
| **DATE:** | APRIL 29, 1998 |
| **INTERVIEWEE:** | RAY LOMBARDI<br>FALLER'S ASSOCIATE<br>LONDON, ENGLAND<br>011 44 1702 716 713 |
| **INTERVIEWER:** | THOMAS C. MYERS |
| **TYPE OF INTERVIEW:** | PHONE |
| **RE:** | U.S. vs JAMES FALLER |

**PRIVILEGED AND CONFIDENTIAL**

8751 West Broward Boulevard • Suite 206 • Plantation, Florida • 33324
Telephone: 954-452-0012 • Facsimile: 954-452-5046

I talked with Ray Lombardi at his residence in London, England. I identified myself and told him the nature of the questioning.

As to Mike Beasley, Lambardi refers to him as a scum bag. Beasley masquerades as a corporate debt collector, when, in fact, he is nothing more than an extortionist in Lombardi's opinion.

Lombardi had observed what he knew to be Faller's BMW parked outside Beasley's office in Umbridge, Slough, a sub-division near Heathrow Airport in London. Lombardi happened to be talking with Beasley and had not mentioned the BMW. Beasley began boasting about his blue left-hand drive BMW, and Lombardi broke in and said that's Jim Faller's car. Beasley said, oh yes, I have confiscated it.

Several weeks later, Lombardi was talking with Beasley, and he told Lombardi that he had "paid off the Russians" with the stock, the Lifeline Biotechnologies stock. Beasley told Lombardi he had taken the stock at the same time he took the BMW.

Beasley also talked to Lombardi about how he burst into Faller's office one time and gave him a really hard time.

Beasley told Lombardi that he has an FBI associate in the U.S. from whom he can get any information he wants.

# MONTGOMERY COUNTY COURT

| | | |
|---|---|---|
| James Faller et al<br>(Plaintiffs) | ] | CIV 96-1676<br>Magistrate Nadine Ballard |
| Vs. | ] | |
| William Reeves et al<br>(Defendants) | ] | |

STATE OF GEORGIA
COUNTY OF RICHMOND

## AFFIDAVIT OF ANGELA R. MORELOCK

Personally appeared before the undersigned-attesting officer authorized to administer oaths, ANGELA R. MORELOCK, who after being duly sworn states on oath the following:

1. I represented Mr. James Faller and Mrs. Tanya Faller in the case of Faller et al vs. Reeves et al.

2. During the time I have represented the Fallers I had many conversations with Thomas Manning, the attorney for Reeves et al.

3. On numerous occasions in conversations with Mr. Manning I offered to have Mr. and Mrs. Faller deposed any time anywhere.

4. At no time was I noticed for the taking of depositions of Mr. and Mrs. Faller in the case 96-1676 in Montgomery County, Ohio.

5. During my representation of the Fallers, Mr. Thomas Manning filed a false bar complaint with the Ohio bar association and the Georgia bar association against me and other knowingly false information with the courts.

Further Affiant sayeth not,

Angela R. Morelock

Angela R. Morelock

Sworn to and subscribed
before me this 14th
day of April, 2000.

Donna Williams

Notary Public
Commission Exp. 10/02

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| U.S. | : | |
| | : | 97-6063-CR |
| vs. | : | Ryscamp |
| | : | |
| RICHARD ADAM, | : | |
| JAMES S. FALLER, II, ET AL | : | |

IN THE STATE OF GEORGIA
COUNTY OF RICHMOND

AFFIDAVIT

Personally appeared Dean Pope before the undersigned officer authorized to administer oaths and states the following:

1. I am a citizen of the United States and over the age of 18.
2. I interviewed, via telephone, Jim Gardner, Joe Gorgle and Bob Van Beaver.
3. All three stated that they were threatened by the FBI before they testified in the above action. Mr. Gardner was threatened by Agent Stidger prior to testifying before the Grand Jury. Mr. Gorgle was threatened by Mr. McAdams prior to testifying at the May 2000 trial and Mr. Van Beaver stated that he was in the witness room with Mr. Gorgle when Joe was threatened.

The above is true and correct to the best of my knowledge.

Dean Pope

Sworn to and subscribed

Before me this 31st day
Of May, 2000.

Notary Public
Notary Public, Richmond County, Georgia
My Commission Expires Sept. 10, 2002

IN THE UNTIED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| U.S. | : | |
| vs. | : | 97-CRIM6063 RYS |
| RICHARD ADAM, JAMES FALLER<br>Et al. | : | |
| Defendants. | : | |

IN THE STATE OF CONNECTICUT
COUNTY OF FAIRFIELD

**AFFIDAVIT OF SIMON K. SCHAFFLER**

1. I am a citizen of the United States and am over the age of 18.
2. I worked for Bear Stearns in the Compliance department from March 1987 through June 1995.
3. I have reviewed Exhibit "1" attached hereto which appears to be a computer generated memo.
4. I do not have any recollection (knowledge) of the Italian bond or anything or anyone addressed in Exhibit "1".
5. I do not know Terry Frost or Vince Lijoi or James Faller.

Further affiant sayeth not.

____________________
Simon K. Schaffler

Sworn to and subscribed
before me this 29th
day of June, 2000.
____________________
Notary Public

CATHERINE M. GILBERT
NOTARY PUBLIC
MY COMMISSION EXPIRES AUG. 31, 2003

6-29-2000 12:10PM FROM THE CALL CENTER 706 210 9522 P.2
JUN.-26' 00 (MON) 10:42
06/23/00 15:53 FAX 15616504528 USAO WEST PALM P.001
002

Lieberbaum & Co., Inc.
600 Old Country Road
Garden City, New York 11530

MEMORANDUM

TO: Richard Adams customer file 178-80023

FROM: Len Neuhaus

DATE: July 17, 1998

RE: Position of 5,000,000 Italian

I was informed on this date by Cy Schaffler of Bear Stearns compliance department that the above referenced position in this account is counterfeit and has been siezed by the Italian government. Cy requested a memo from the broker relating to his knowledge of the customer, how the customer obtained the position and other relevant items which will be passed on to Cy Schaffler. I called Terry Frost and Vince Lijoi in our Tampa office and informed them of this information. They will speak to Jim Faller, the broker on the account who will prepare the memo. They were instructed to tell Faller not to mention this to the client as the FBI may be involved due to the counterfeit bond.

cc: B. Clendenin
T. Frost
J. Israel
M. Lew
V. Lijoi

IN THE COUNTY OF Hillsborough
The State of Florida

AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, DEBRA PRICE, who after being duly sworn states on oath, the following:

1. I am a resident of the State of Florida and am over the age of 18.
2. I was an assistant and secretary at the investment banking firm Lew Lieberbaum during the year 1992
3. During my employment at Lew Lieberbaum I came to know James Faller, he was employed as a stockbroker at the same firm and in the same office.
4. Terrance Frost was the manager and part owner of the branch office of Lew Lieberbaum where James Faller and I worked.
5. During this time, I was aware that James Faller was called into Terrance Frost's office and told by Mr. Frost that one of his clients had deposited with the firm a counterfeit bond. It is my recollection that Mr. Frost tried to humiliate Mr. Faller with this information.
6. Mr. Frost instructed Mr. Faller to have me prepare the attached exhibit ("A") and to send it to the client immediately.
7. I am aware that Mr. Faller was a significant witness against Lew Lieberbaum and Mr. Terrance Frost involving more than one legal issue.

Further affiant sayeth not.

[signature]
DEBRA PRICE

Sworn to and subscribed befor me this 12 day of July, 2000

[signature]
Notary Public

Margaret C. Lowe
Commission # CC 931833
Expires May 2, 2003
Bonded Thru

PLAINTIFF'S EXHIBIT 11

IN THE COUNTY OF Columbia
The State of Georgia

## AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, Anne Nielsen, who after being duly sworn states on oath, the following:

1. I am a resident of the State of Georgia and am over the age of 18.
2. I reside at 3553 Granite Way Augusta, Georgia and have been a neighbor and friend of James and Tanya Faller since early 1996.
3. During the time that James Faller was in prison, I visited Tanya Faller often.
4. On one occasion, while I was present, Tanya Faller received a threatening telephone call. Tanya Faller was pregnant at the time and as a result of this call she turned sheet white.
5. Immediately following this call I questioned Tanya Faller as to the nature of the call. She stated to me that she had just received another "death threat" from a federal agent named Allen Stidger.
6. After I pressed her on the issue of these threats she stated that she had received several of these type threats.

Further affiant sayeth not.

Anne Nielsen
Anne Nielsen

Sworn to and subscribed before me this 31 day of July, 2000

[signature]
Notary Public
Commission Exp 10/02

IN THE COUNTY OF Columbia
The State of Georgia

# AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, Tanya L. Faller, who after being duly sworn states on oath, the following:

1. I am a resident of the State of Georgia and am over the age of 18.
2. I am the wife of James S. Faller II and have been married to him since August 15, 1995.
3. During the course of my marriage I have received many threats from two different persons.
4. I know the first person as Michael Beasley, AKA Chris O'Brien.
5. The second person I have come to recognize as FBI agent Allen Stidger who has a very distinctive voice and is unmistakably the person who telephoned me many times.
6. Just prior to my husbands arrest and during the entire duration of his incarceration, agent Stidger would call and make numerous threats to include; having me killed and "we know where your kids go to school" He would always say "if you just tell us where the money is etc."
7. In addition to agent Stidger, Michael Beasley would call and threaten to have me raped and murdered as well as other threats, i.e. "having other persons come to see me."
8. During a trip to London England with my husband, December 1996, Michael Beasley called the hotel we had just arrived at and threatened our lives. The police moved us to another hotel. The police told us they would do nothing because Beasley worked for the FBI.

9. In early 1997, I went with my husband, Attorney Joseph Denion, Beverley Candlish, and Sheriff Ron Bartlett before Judge David Huguenin in an attempt to stop the harassment from what we then believed to be only Michael Beasley.

10. Mr. Beasley bragged to me that he was working for FBI agent Allen L. Stidger.

11. The court refused to issue a warrant for Mr. Beasley.

12. Mr. James Mc Adams, has threatened me with indictment in writing, if my husband does not plea to the charges of the current case (97-6063CR Ryscamp).

Further affiant sayeth not.

Tanya L. Faller

Tanya L. Faller

Sworn to and subscribed before me this 31 day of July, 2000

Donna Williams

Notary Public

Commission Exp 10/02

IN THE COUNTY OF Columbia
The State of Georgia

# AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, Tanya L. Faller, who after being duly sworn states on oath, the following:

1. I am a resident of the State of Georgia and am over the age of 18.
2. I am the wife of James S. Faller II and have been married to him since August 15, 1995.
3. During the course of my marriage I have received many threats from two different persons.
4. I know the first person as Michael Beasley, AKA Chris O'Brien.
5. The second person I have come to recognize as FBI agent Allen Stidger who has a very distinctive voice and is unmistakably the person who telephoned me many times.
6. Just prior to my husbands arrest and during the entire duration of his incarceration, agent Stidger would call and make numerous threats to include; having me killed and "we know where your kids go to school" He would always say "if you just tell us where the money is etc."
7. In addition to agent Stidger, Michael Beasley would call and threaten to have me raped and murdered as well as other threats, i.e. "having other persons come to see me."
8. During a trip to London England with my husband, December 1996, Michael Beasley called the hotel we had just arrived at and threatened our lives. The police moved us to another hotel. The police told us they would do nothing because Beasley worked for the FBI.

9. In early 1997, I went with my husband, Attorney Joseph Denion, Beverley Candlish, and Sheriff Ron Bartlett before Judge David Huguenin in an attempt to stop the harassment from what we then believed to be only Michael Beasley.

10. Mr. Beasley bragged to me that he was working for FBI agent Allen L. Stidger.

11. The court refused to issue a warrant for Mr. Beasley.

12. Mr. James Mc Adams, has threatened me with indictment in writing, if my husband does not plea to the charges of the current case (97-6063CR Ryscamp).

Further affiant sayeth not.

Tanya L. Baller
Tanya L. Baller

Sworn to and subscribed before me this 31 day of July, 2000

Donna Williams
Notary Public
Commission Exp 10/02

EXHIBIT 7

COPY

IN THE COUNTY OF Tarrant
The State of Texas

AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, Joanne L. Ryan, who after being duly sworn states on oath the following:

1. I am a resident of the State of Texas and I am over the age of 18.

2. In early 1994, I had lunch with Kathleen Faller (Kathy), at which time Kathy had her children (Jennifer, Sarah and Jaime Faller) in Ohio with her.

3. During this lunch Kathy and I discussed my brother James Faller taking their three children (Jennifer, Sarah and Jaime) to Europe for an extended period of time.

4. Kathy stated that she needed my brother to take the children for an extended period of time so she could attend a trade school in Ohio. She also told me that he was taking the children to Europe.

5. Kathy stated that the children were going to Europe to live with their father James and stated that she thought it would be a great learning experience for the children.

Further affiant sayeth not.

Joanne L. Ryan

Joanne L. Ryan

State of Texas County of Tarrant City of Arlington
of this August 1, 2000 personally appeared the above named deponent, Joanne L. Ryan, who, having been first duly sworn, acknowledged the foregoing under oath before me,

Beverly Jo Rosell

Notary Public
My commission expires:
January 10, 2004

BEVERLY JO ROSELL
Notary Public, State of Texas
My Commission Expires
January 10, 2004

AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, Beverley Candlish, who after being duly sworn states on oath, the following:

1. I am a resident of the Province of Ontario Canada and am over the age of 18.
2. On numerous occasions I have been present when Michael Beasley AKA Chris O'Brien has threatened James Faller.
3. I have personally received threats directed at James Faller by Michael Beasley.
4. Michael Beasley "bragged" to me that he "worked for FBI agent Stidger."
5. In December 1996 I traveled to London England with James Faller and his wife Tanya. Shortly after our arrival, Michael Beasley called the hotel asking for me giving a false name. He then called to James Faller's room and spoke to Tanya Faller. She became hysterical after speaking with Beasley. She said that Beasley had threatened to have James killed and her raped. We immediately contacted the local police. The police moved us to another hotel and instructed us to come to the Croydon Park police station in the morning.
6. The Police at the station refused to do anything because they stated that a Mr. Beasley contacted them and they were led to believe that he worked with the FBI in the United States.
7. In early 1997, in an attempt to put an end to Beasley's threats, lies and harassment, James Faller, Tanya Faller, Attorney Joseph Denion, Sheriff Deputy Ron Bartlett and I went to Columbia County Magistrate Judge David Hugeuenin. The courts refused to take action.
8. Michael Beasley contacted Wachovia Bank and spoke to a Mr. Neil Hines and informed him that James Faller was a drug dealer and money launderer

9. Joseph Denion made it clear to me that he had represented James Faller in numerous issues involving the Richard Adam case and that Mr. Faller was as he called it a "Patsy" and was innocent of any wrongdoings.

10. Joseph Denion also stated to me that he had a vast knowledge of all Mr. Faller's business dealings in Europe and the United States, all of which he believed to be valid and legitimate.

11. Immediately following James Faller's arrest, Michael Beasley called me and stated "what do you think of Faller now?"

Further affiant sayeth not.

Beverley Candlish

Sworn to and subscribed before me this 2ND day of August 2000.

Notary Public

PAUL F. SMITH
Barrister & Solicitor
202 - 5700 Highway No. 7
Markham, Ontario
L3P 1A8
(905) [illegible]

STATE OF FLORIDA
COUNTY OF HILLSBOUROUGH

## AFFIDAVIT OF GLADYS SIERRA

Personally appeared before the undersigned attesting officer authorized by law to administer oaths, Gladys Sierra, who after being duly sworn states on oath the following:

1. I am a United States citizen and over the age of 18.
2. I was formerly the personal secretary for James Faller at the company First Quantum International located in Tampa Florida.
3. I was employed by First Quantum through an employment agency
4. During the course of my employment the only deals that Mr. Faller was involved in were the promotion of publicly traded stock and the affiliated companies.
5. Early in my employment, Mr. Faller left for Europe to continue this promotion.
6. Immediately following Mr Faller's departure, Natale Malfa, David Dunn, Dennis Schuermann, Dominick Maggio and Mark Blanchard began other forms of transactions, which I did not understand.
7. It was very apparent that Mr. Malfa. Mr. Dunn and Dennis Schuermann were "running the show" at this point.
8. Numerous times Mr. Schuermann would have me translate documents for him into Spanish. He would insist that I do this in his office, in his presence.
9. From the very beginning of Mr. Faller's trips to Europe Mr. Malfa and Mr. Dunn would try to intimidate me and demanded that I did not tell Mr. Faller what was going on in the office and in no way should Mr. Faller be informed of the deals in the office.
10. Mr. Malfa would also call me at home and try to threaten me.
11. Mr. Malfa and Mr. Schuermann were involved in a transaction with a Dr. Vergote. This deal was of particular concern to Mr. Malfa and Mr. Dunn that I not tell Mr. Faller anything about the dealings in the office.

12. Dominick Maggio had an office within the same office space as Mr. Malfa and Mr. Dunn. Mr. Maggio was aware of all of the dealings of Mr. Dunn, Mr. Malfa and Mr. Schuermann.

13. Mr. Malfa had a rubber stamp of the signature of James Faller.

14. Mr. Malfa had control over the personal accounts of James Faller and was running monies through them. In addition Mr. Malfa had control of all of the company accounts.

15. Ginny Blanchard was the company bookkeeper and is the wife of Mark Blanchard.

16. Lori Snead was the company receptionist/secretary.

17. Lori Snead told me that "the company was in some sort of trouble" and that "Ginny Blanchard was hiding money in the books so Mr. Faller would not know about it".

18 Mr. Malfa, nor anyone else ever told me that Mr. Faller was using company funds in Europe, in fact they told me that he had his own company in Europe and had put funding in place and that they wanted to try to get to it.

19 The last time I spoke with Mr. Faller concerning the above was when he called the First Quantum Office in early 1994. At this time I told him that Dave Dunn and Natale Malfa had taken over.

20. Prior to this event, each time Mr. Faller would call from Europe, Mr. Dunn, Mr Schuermann or Mr. Malfa would rush into my office and stand there making certain I could not tell Mr. Faller what was going on.

Further affiant sayeth not.

Angela M Smith
My Commission CC817672
Expires March 18, 2003

Angela M. Smith

Gladys Sierra

08/08/2000
Personally known to me.

IN THE COUNTY OF Seminole
The State of Florida

# AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, Leah Zalewski, who after being duly sworn states on oath, the following:

1. I am a resident of the state of Florida and am over the age of 18.
2. I was the fiancé and legal assistant of Joseph Denion.
3. I gave birth to a baby that was conceived with Joseph Denion.
4. Numerous times Joseph told me about his client and friend James Faller and stated that he was being charged with a crime he did not commit.
5. Not only was Joseph in fear of his life due to his knowledge of James Faller's case and his innocence, Joseph became fearful for my life and the lives of my family because "James was up against a group of very corrupt government people with an enormous amount of power and influence and I had personally spoken with James Faller".
6. I am aware of a person named Mike Beasley and that he was involved in some fashion. Joseph always referred to him as the "Bad Guy".
7. Joseph stated to me that he was fearful the government would try to get at his files. He made it clear that the disappearance of his files would jeopardize the case of James Faller and others.

Further affiant sayeth not,

Leah Zalewski (signature)
Leah Zalewski

Witness:

(signature)
Cynthia Farrand

STATE OF FLORIDA
COUNTY OF Seminole

JOHN R. FAISON
MY COMMISSION # CC 811704
EXPIRES: February 23, 2003
Bonded Thru Notary Public Underwriters

Sworn to (or affirmed) and subscribed before me this 10 day of August, 2000 by LEAH ZALEWSKI

(SEAL)

(signature)
PRINT, TYPE OR STAMP NAME OF NOTARY

IN THE COUNTY OF Fairfield
The State of Connecticut

# AFFIDAVIT

1. I am a resident of the State of Connecticut and I am over the age of 18.

2. I reside at 30 Vanech Drive, Stamford, CT. and have worked with Barbara Murray and her real estate company since 1987. I served on the Board of Representatives in the City of Stamford from 1991-1993 and 1995-1997 which is an elected position.

3. On May 22, 2000 the FBI contacted me in my office Murray Real Estate Services, Inc. at 999 Summer St Stamford, CT.

4. On May 22, 2000 S.A. Lisa Skelly delivered a subpoena to me at 999 Summer St office. I was informed that I had to travel to Florida on May 23, 2000. The agent asked me to call the U.S. Attorney's office in Florida and I was asked if I was a bookkeeper or an auditor or something to do with finances.

5. On May 22, 2000 I spoke with USAO James McAdam. I asked him what this subpoena was all about. McAdam told me that he wanted to talk with me and that there was no trouble. He informed me that I did not do anything wrong. McAdam wanted me in Florida the next day to ask me some questions at 12 noon. I advised him that I was not involved with IBSA at all.

6. I informed Mr. McAdam and the S.A. Skelly that I lived with my elderly mother who is 80 years old and sick. I told them that it was difficult for me to leave her alone. This trip was very traumatic for her and for me.

7. On May 23, 2000 I traveled to Florida. In the witness room at the West Palm Beach Federal Courthouse I met S.A. Kevin Lubke and USAO James McAdam. Mr. McAdam threatened and intimidated me. He told me that I could go to jail for money laundering and I should have been one of the defendants. McAdam told me that there was $90,000 worth of checks I cashed. He left Mr. Robert Van Beever and me in the witness room for over 45 minutes and when he returned he

said that I was free to go. I left immediately with Robert Van Beever. I was very upset and shaken.

8. Mr. McAdam brought me down to Florida on false pretense.

Joseph Gergle

Subscribed to sworn to before me this 15th day of August, 2000.

Notary Public
Commission 10/30/01

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

**AFFIDAVIT OF JOHN HILLS** COPY

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, JOHN HILLS, who after being duly sworn states on oath, the following:

1. I am a United States citizen and over the age of 18.
2. In early 1994 I accompanied Peter Skemp to the offices of First Quantum International.
3. Upon our arrival we met with a man named David Dunn and others in the office, Jim Faller was not present.
4. We were told that Jim Faller has left for Europe and that they were taking over.
5. Mr. Dunn informed us that Jim Faller had no idea how to do self-liquidating loans and that he did.
6. Mr. Faller never asked us for any money.

Further affiant sayeth not.

[signature]
JOHN HILLS

18th Day of August 2000
[signature]

ANNE E. MCCLUNG
Notary Public, State of Florida
My comm. expires Mar. 08, 2004
No. CC917017

IN THE COUNTY OF Lee
The State of Florida

# AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, Robert Van Beever, who after being duly sworn states on oath, the following:

1. I am a resident of the State of Florida and I am over the age of 18.

2. I reside at 1033 SE 19th Place, Cape Coral, Florida 33990

3. I am retired. Former President, Association of Former Intelligent Officers. New England Chapter, Special Investigator for U.S. Treasury Dept., U.S. Customs Service and FEMA. Member of retired CIA officers, West Coast Florida Chapter.

4. In May 1994 S.A.Allen Stidger asked me to work with him and the FBI on a case involving IBSA. Agent Stidger gave me a code word to use to identify myself to him.

5. Agent Stidger asked me to keep tabs on Barbara Murray. On a daily basis he would instruct me to question Barbara Murray. I would report back to him with her answers.

6. Agent Stidger made condescending comments about Barbara Murray to me. He made comments about Ms. Murray and myself having a sexual affair. After he starting making these comments which were continuous I started having martial problems resulting in a divorce.

7. I provided Agent Stidger with tapes the Ms. Murray recorded of Richard Adam, Roland Colon, James Faller and other people at my direction.

8. At no time did I ever receive any monies from the FBI., including my own expenses i.e.: tapes, telephone, secretarial help and other office expenses.

9. Agent Stidger would express his perverted attitude towards women and especially Barbara Murray in a very gross manner.

10. Agent Stidger wanted me to persuaded Ms. Murray to confess to a situation that I was certain Ms. Murray was not guilty of. Agent Stidger repeatedly called me and asked me to persuade Ms. Murray.

11. I was present in the witness room with Joseph Gergle on May 23, 2000 at the West Palm Beach Federal Courthouse when Joseph Gergle was threatened.

Robert Van Beever

Subscribed and Sworn before me this 19 day of August, 2000

Christine A. Garland
MY COMMISSION # CC604539 EXPIRES
December 1, 2000
BONDED THRU TROY FAIN INSURANCE, INC.

Christine A Garland

IN THE COUNTY OF HILLSBOROUGH
The State of Florida

# AFFIDAVIT OF COPELAND NEWBERN

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, COPELAND NEWBERN, who after being duly sworn states on oath, the following:

1. I am a resident of the state of Florida and am over the age of 18.
2. I was formerly the Chairman of the Federal Reserve in Jacksonville Florida.
3. I arranged and attended a meeting with Mr. James Faller, Rolan Colon, Richard Adam and Robert Forestall, which took place at the Atlanta Federal reserve, located in Atlanta Georgia.
4. The morning of the meeting I met with James Faller, Rolan Colon and Richard Adam at the Omni Hotel for breakfast.
5. This meeting took place in the fall of 1993.
6. I specifically recall this meeting because I had to drive from my sister-in-laws home in ~~South Carolina~~ GEORGIA. Following the meeting I met with some of my citrus customers.
7. Mr. Faller has never asked me for money.
8. Mr. Faller has never in my presence told anyone that he or Richard Adam has ever funded a loan.
9. Particularly, I have extensive knowledge of Consource Plastic Recycling. In my presence, Mr. Faller never told or otherwise inferred to Consource, Robert Cameron or Vince Tifer that he or Richard Adam funded any loans. In fact he always said "he would tell us as soon as they did."

Further affiant sayeth not,

STATE OF FLORIDA

[signature] Aug. 21, 2000
COPELAND NEWBERN Date 8- -2000

COUNTY OF HILLSBOROUGH

The foregoing instrument was acknowledged before me this 21 day of August, 2000 by Copeland Newbern. He is personally known to me ~~or has produced a Florida driver's license number ________ as identification.~~

[signature]
NOTARY PUBLIC, STATE OF FLORIDA
Print Name:

E. C. Langford
MY COMMISSION EXPIRES July 17, 2002
#CC758964
Bonded thru Troy Fain-Insurance
NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:

My Commission Number:

STATE OF TENNESSEE
COUNTY OF SHELBY

**AFFIDAVIT**

BEFORE ME the undersigned authority personally appeared Thomas W. Vastrick, who after first being duly sworn deposes and says:

1. My name is Thomas W. Vastrick. I am a resident of the State of Florida and the County of Seminole. I maintain offices in Maitland, FL and Memphis, TN.

2. I am a board certified forensic document examiner with over 22 years of experience, competent to make this Affidavit and all statements made herein are based on my personal knowledge.

3. I completed a two-year training program with the U.S. Postal Inspection Service. I am certified by the American Board of Forensic Document Examiners. I am a member of the American Society of Questioned Document Examiners, The American Academy of Forensic Sciences (Questioned Documents Section), and The Southeastern Association of Forensic Document Examiners. I have testified over 125 times in federal, state, local courts, arbitration and administrative law hearings and military hearings. I have written and had published numerous original research articles and have conducted lectures and workshops to law enforcement, corporate loss prevention, law firms and fellow document examiners.

4. It was requested that I conduct certain examinations of certain documents provided to me on July 12, 2000. The findings regarding certain documents submitted are as follows:

A. The documents for this particular issue consist a copy of one page from a spiral ring book with a picture of a plane and words beginning, *"In the fast paced world of business..."* (hereafter referred to as Exhibit A) along with a copy of one sheet of lined paper referencing The Securities Exchange Act of 1934 (hereafter referred to as Exhibit B).

B. It was requested that a comparison be conducted between non-initial entries on Exhibit A and the entries at the top of Exhibit B in order to determine whether these entries were written by the same person.

C. Based on the examination conducted it is the conclusion of this affiant that the entries *"J-you got it"* on Exhibits A and B are two different copies from the same source writing (i.e. such as "cut and paste").

D. This finding is based on the exact replication noted between these common entries.

5. Further Affiant sayeth naught regarding these specific documents.

[signature]
Signature of Affiant

Sworn and subscribed to this ~~12~~ 13th day of ~~June~~ July 2000.

[signature]
Signature of Notary

My commission expires 12-31-2004

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

## AFFIDAVIT OF PETER SKEMP

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths, PETER SKEMP, who after being duly sworn states on oath, the following:

COPY

1. I am a United States citizen and over the age of 18.
2. In January 1994 I accompanied John Hills to the offices of First Quantum International.
3. Upon our arrival we met with David Dunn, Jim Faller was not present.
4. We were told that Jim Faller has left for Europe and that they were taking over.
5. Mr. Dunn informed us that Jim Faller had no idea how to do self-liquidating loans and that he, did. David Dunn said, "he would get the deals done!"
6. David Dunn asked that I put up property to assist him in the deals he was doing, which I declined.
7. Mr. Faller has never asked us for any money.

Further affiant sayeth not.

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

PETER SKEMP

The foregoing instrument was acknowledged before me this 24 day of April, 2000 by Peter Skemp. He is personally known to me ~~or has produced a Florida driver's license number~~ ____________ ~~as identification.~~

NOTARY PUBLIC, STATE OF FLORIDA

Print Name

E. C. Langford
MY COMMISSION EXPIRES July 17, 2004
#CC758964
Bonded thru Troy Fain Insurance
NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:

My Commission Number:

IN THE COUNTY OF RICHMOND
STATE OF GEORGIA

COPY

AFFIDAVIT

Personally appeared Dean Pope, who, being duly sworn, states that he personally served Kathleen Kilpatrick on April 20, 2000. The service was hand delivered at 3521 Granite Way in the Barrington Subdivision in Augusta, Georgia. As I delivered the subpoena, I observed several vehicles that appeared to be FBI vehicles in the neighborhood of Barrington Subdivision. Angela Morelock, Attorney at Law, accompanied me on this service.

Dean Pope

Notary:

This 18th day of October, 2000
Commission Exp 10/02

STATE OF FLORIDA
COUNTY OF Dade

COPY

## AFFIDAVIT

Personally appeared before the undersigned attesting officer authorized by law to administer oaths HOWARD GALBUT, after being duly sworn states on oath the following:

1. I am a citizen of the United States and am over the age of 18.
2. I represented James S. Faller in the case of Faller vs. Faller, Case No. 94-007639-FD-023.
3. Mr. Faller and I attended a hearing on or about May 2, 1994. The hearing was scheduled on various motions to be heard by Judge Charles Cope.
4. Mr. Faller and I arrived approximately 45 minutes before the time of the hearing.
5. After waiting 15 minutes I checked with the judge's secretary to let her know we were there.
6. Mr. Faller and I stayed in hallway in front of the judge's office. Occasionally we walked up and down the hallway that was approximately 25 feet from the door to the judge's office.
7. The judge was late so we stayed 15 minutes past the scheduled time of the hearing. All total we were there for one hour.
8. During that hour Jim was served with a lawsuit.
9. After we read the lawsuit the judge's bailiff called us into the judge's chambers.
10. Before we were seated, the judge said there was a matter to be dealt with prior to the hearing.
11. Then Agent Stidger explained who he was and that he had a subpoena for Jim and handed it to him then left.
12. This took place in the judge's chamber which was approximately 12' X 18' feet.
13. Present was the judge, myself, Mr. Faller, Mrs. Faller, her attorney and Agent Stidger.

Further affiant sayeth not.

Howard Galbut

Sworn to and subscribed
before me this 19
day of October, 2000.

Abigail Colon

Abigail Colon
MY COMMISSION EXPIRES
August 7, 2002
#CC739808
Bonded thru
Troy Fain-Insurance
NOTARY PUBLIC, STATE OF FLORIDA

IN THE COUNTY OF RICHMOND
STATE OF GEORGIA

AFFIDAVIT

Personally appeared Jim Gardner, who, being duly sworn, states that he had a telephone conversation with Agent Kevin Luebke just prior to the May 2000 trial. Mr. Luebke stated that I was on standby for the trial. Mr. Luebke asked me if I would, knowing what I know, with my experience as a prosecutor/investigator, would I prosecute. I stated no and Mr. Luebke stated, "Yeh, you are probably right"

I met with two supervising agents from the Tampa office of the FBI. Jim Livingston was the senior supervisor who was one of the individuals. Mr. Livingston was instructed by OPR supervisor/agent Bill Woerner to investigate my complaint against Allen Stidger.

Just prior to my testimony before the Federal Grand Jury in Ft. Lauderdale, Florida, Allen Stidger, who was left alone with me in the witness waiting room, after the U.S. Attorney left us alone, stated to me, "When you get in there you better tell the truth, if you are here to lie and cover up for Faller, I will make your life miserable". I stated to him that I have been testifying in court for over thirty years and have not lied yet and that I was going to tell the truth and if that wasn't what he wanted to hear, that was too bad. Mr. Stidger then stated if you go in there and lie, you will regret this day forever. At that point the state attorney came back into the room and she asked what was going on and I stated the agent just threatened me. The state attorney then told Mr. Stidger to leave the waiting room. She apologized to me and said that Mr. Stidger should not have been in the room with me.

Jim Gardner

Jim Gardner

Notary: Connie Couto

CONNIE P. COUTO
MY COMMISSION # CC 886913
EXPIRES: November 9, 2003
Bonded Thru Notary Public Underwriters

This 20th day of October, 2000

Signed before me by Jim Gardner
Drivers License provided as ID.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| VS. | : | Case No. |
| | : | 97-6063-CR-RYSKAMP |
| JAMES STUART FALLER, II, | : | |
| Defendant. | : | |

---

**AFFIDAVIT OF JAMES S. FALLER, II**

**COUNTY OF RICHMOND**
**STATE OF GEORGIA**

Personally appeared before the undersigned attesting officer authorized by law to administer oaths **JAMES STUART FALLER, II**, who after being duly sworn states on oath the following:

1. I am a citizen of the United States and am over the age of 18.
2. I was first arrested in the above matter on August 22, 1997.
3. I was held for 10 ½ months after that arrest before having a bond hearing. (I appealed to the 11th Circuit Court of Appeals before I was granted a bond hearing).
4. In May 1998 Judge Ann Vitunic held six days of hearings regarding my request for bond.
5. I was finally released on June 30, 1998 on a $500,000.00 corporate surety bond that was processed through Ace Bonding and its owner Richard Arenas.

6. The bond was paid as followed: Myra Dixon put up the title to some property she owns in Florida and some stock owned by her and her son (Richard Dixon); Mrs. Tanya Faller put up her home in Augusta, Georgia; and the remaining $75,000 was to be paid in cash in three equal installments.

7. I borrowed money from friends to pay the first two installments. The last installment was paid on or before November 30, 2000 or December 1, 2000. Again the money was borrowed from two separate friends of mine and was wired to Mr. Arenas' account per his instructions as given to my attorney Mrs. Angela Morelock.

8. Mr. Arenas through his counsel informed Mr. Gillen that all of the assets he holds for bond have been returned to the rightful owners. Ms. Myra Dixon and Mr. Richard Dixon have provided affidavits stating that the title to the property in Florida nor the stock certificates have been returned.

9. When I was arrested for the second time on August 24, 2000 my wife and my attorney, Angela Morelock, began receiving calls from my friends and family after they found out I had been arrested. Everyone who called wanted to know what they could do to help me and if my wife and children needed anything.

10. Prior to being escorted to the prison door for release on November 30, 2000 I did not know when I would be released. Although Judge Ryscamp had signed an order releasing me, my attorney Angela Morelock indicated to me, via a telephone conversation, that Mr. Gillen and Mr. Froelich ( my criminal attorney's) had asked her to wrap up the details for my release.

11. In an abundance of caution Mrs. Morelock contacted Mr. Arenas to notify him of my release and to question him about my bond status with him. Her conversation with him is explained in her affidavit. My wife also spoke with Mr. Arenas regarding my bond and her conversation is explained in her affidavit.

12. Since my release on June 30, 1998 my family and I have survived through the graciousness of our friends and family.

13. When my wife and I were unable to buy groceries our friends and family bought them for us.

14. My wife and I knew that our children would have nothing to open for Christmas 1998. To our surprise on Christmas Eve 1998 Richard Dixon stopped by with gifts for everyone.

15. My wife and I have borrowed money from everyone we know to buy groceries, pay utility bills, post my bond money and pay my enormous legal bills.

16. Our friends and family have paid for these things because they love us and want to help us.

17. Quite simply I have borrowed from my friends and family to the point that they have no more to give. They have given all to help my family and me.

18. There is no more money or property to pay bond with.

19. I am not a flight risk and I am not a threat to the community.

20. I have been to every court hearing and will be at all subsequent hearings as well.

21. I check in on schedule with my supervising officer, Mr. Tim Corbin.

22. Anytime I leave the county for any reason I notify Mr. Tim Corbin via telephone and usually follow up with a letter from one of my attorney's.

23. I have never denied Mr. Corbin the opportunity to visit my home anytime he wants. He is also welcome to check with my employer anytime he wants.

Further affiant sayeth not.

James Stuart Faller, II

Sworn to and subscribed
before me this 26th
day of December, 2000.

Notary Public

**Notary Public, Richmond County, Georgia**
**My Commission Expires Sept. 10, 2002**

## AFFIDAVIT OF

Be it acknowledged, that Mr. James S. Faller II, of Augusta, Ga., USA, telephone (706) 854-8965, SS# 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, the undersigned deponent, being of legal age, does hereby depose and say under oath the following:

1.) I am over the age of eighteen (18) years old and have personal knowledge of all the facts contained herein.
2.) I was a plaintiff – counter defendant in a lawsuit filed in Montgomery County, Ohio, Case # 96-1676 and entitled James S. Faller II, et al vs. William Reeves, et al.
3.) I and the other plaintiffs – counter defendants' originally engaged attorney George R. Royer to prosecute our claims and defend any counter claims.
4.) I and the other plaintiffs – counter defendants decided to replace attorney George R. Royer with attorney William C. Bittner.
5.) Unbeknownst to me and the other plaintiffs – counter defendants, Mr. Bittner died prior to entering an appearance or answering pending motions.
6.) I and the other plaintiffs and counter – defendants had no notice of Mr. Bittners death until after the default judgement was entered on April 1, 1998.
7.) I and the other plaintiffs – counter defendants believed the matter was being handled by Mr. Bittner and we were totally surprised that the judgement was entered.
8.) At no time did I or any of the plaintiffs – counter defendants have any notice or reason to believe that Mr. Bittner was not vigorously pursuing the case and answering pending motions.
9.) I and the other plaintiffs – counter defendants were not notified of Mr. Bittners death until after the default judgement was entered on April 1, 1998 and we have had no opportunity to seek replacement counsel.

FURTHER SAYETH NOT

[signature]

James S. Faller II

Michelle Reneé Landrum

[signature]

Notary Public, Columbia County, Georgia
My Commission Expires June 8, 2001

COPY

PLAINTIFF'S EXHIBIT 12

STATE OF GEORGIA
COUNTY OF COLUMBIA

AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths Mary Dixon after being sworn states on oath the following:

1.) I am a citizen of the United States and am 18 years old.
2.) I fully understand what "truth" is defined as.
3.) I am the stepdaughter of James Faller.
4.) I was subpoenaed to testify on December 7, 2001 concerning threats made directly to my family and I by FBI agent Alan Stidger and Mike Beasley in case 97-6063.
5.) I traveled to West Palm Beach Florida fully expecting to testify to matters concerning the threats.
6.) Upon our arrival at the courthouse I became aware of agent Stidger's presence and witnessed first hand the following events.
7.) A Mr. Joseph Gergle, who became known to me returned from the courtroom where the hearing was taking place.
8.) Mr. Gergle was literally hysterical from the events that apparently happened in the courtroom. Mr. Gergle was shaking and crying. He stated many times in a hysterical manner "they're (the govt.) going to get me." He also stated "he would not want to go through what Barbara has." (Meaning Barbara Murray). Mr. Gergle also said," He was going to have to cooperate with the government."
9.) There is no question that Mr. Gergle was terrified because he told all of us "the Government threatened him in the court room and the judge let it go on."
10.) During our stay in West Palm Beach I was asleep in our hotel room with my sister Sarah Faller. Sarah and I received two calls where the person on the phone was heavy breathing and then hung up. My sister and I called our parents who were away shopping.
11.) Both before and after the calls strange persons followed us in and around the hotel.
12.) On one occasion I saw agent Stidger at the hotel reading the paper.
13.) My father contacted the US Marshall's office and the West Palm Beach police came to the hotel. The police moved us to another room under another name.
14.) I was particularly afraid because the reason I was there to testify was because agent Stidger had called our home in Augusta and directly threatened me while my stepfather was in jail. He would identify himself and say, "This is special agent Stidger. Put your mother on the phone" when I replied "she's not here" He would then say "you better cooperate." he would then say "you better watch out because I know where your sister (meaning my little sister Jaime) is right now and I know where she gets off the bus."

15.) On a few occasions I would see agent Stidger in our neighborhood. He would be parked in the neighborhood.
16.) Because my mother was terrified from the threats she endured in the courthouse by agent Stidger she would not testify out of fear.
17.) My mother was terrified as a result of the threats imposed on her both before and at the hearings held in West Palm Beach Florida.
18.) I am aware that my mother has been directly threatened and followed many times by agent Stidger and Mike Beasley.
19.) I personally have been followed by agent Stidger.

Further Affiant sayeth not.

Mary Dixon
Mary Dixon

In the state of Georgia county of Richmond sworn to and subscribed before me this 6 day of June, 2002

My Commission expires on NOTARY PUBLIC COLUMBIA COUNTY MY COMMISSION EXPIRES 6-15-03

Connie M. Mele

PLAINTIFF'S EXHIBIT 13

STATE OF KENTUCKY
COUNTY OF RUSSELL

# AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths Tanya Faller after being sworn states on oath the following:

1.) I am a citizen of the United States and am over 18 years old.
2.) I fully understand what "truth" is defined as.
3.) I am the wife of James Faller.
4.) I was asked to testify on December 7, 2001 concerning threats made directly to my family and I by FBI agent Alan Stidger and Mike Beasley in case 97-6063.
5.) I traveled to West Palm Beach Florida fully expecting to testify to matters concerning the threats and activities of my husband concerning the case.
6.) Upon our arrival at the courthouse I became aware of agent Stidger's presence and witnessed first hand the following events.
7.) A Mr. Joseph Gergle, who became known to me returned from the courtroom where the hearing was taking place.
8.) Mr. Gergle was literally hysterical from the events that apparently happened in the courtroom. Mr. Gergle was shaking and crying.
9.) He stated many times in a hysterical manner "they're (the govt.) going to get me." He also stated "he would not want to go through what Barbara has." (Meaning Barbara Murray). Mr. Gergle also said," "I cannot afford a lawyer" he also said "he could not afford to be arrested because he was taking care of his sick mother and would do whatever it took to keep from being arrested." There is no question that Mr. Gergle was terrified because he told all of us "the Government threatened him in the court room and the judge let it go on." He would repeat over and over "I haven't done anything, how could they do this to me and how could a judge allow this in a courtroom?"
10.) During our stay in West Palm Beach I was away shopping with my husband. We received a call from our two daughters, Mary and Sarah who were terrified because they were receiving harassing calls in the hotel room.
11.) My daughters, Ann Nielsen (another intended witness), my husband and I were followed during our stay by persons not known to us.
12.) On one occasion I saw agent Stidger at the hotel reading the paper.
13.) My husband contacted the US Marshall's office and the West Palm Beach police came to the hotel. The police moved us to another room under another name.
14.) Upon arrival of the police at the hotel there were many cars who quickly departed from the parking lot.

15.) I was particularly afraid because the reason I was there to testify was because agent Stidger had called our home in Augusta and directly threatened me while my husband was in jail. He would identify himself and say, "This is special agent Stidger. If you just tell me where the money is this will be over with." He would state that he was aware of the threats from Michael Beasley and they would also stop once the money was found. On another occasion Mr. Stidger told me that

16.) Mr. Beasley worked for him. Mr. Beasley would call and threaten to rape and murder me. On one ocassion Mr. Beasley said "my love they will cut the baby from you r stomach", I was months into my pregnancy. Agent Stidger told me "he was well aware of the threats but until they recovered the money all the threats would stop."

17.) During my attendance at the court house in West Palm Beach, Agent Stidger stated to me "you will not screw with me." I notified Craig Gillen imediately.

18.) Because I was terrified from the threats I endured in the courthouse by agent Stidger I would not testify out of fear.

19.) I previously was threatened by Mr. McAdams in the exact fashion as was Joseph Gergle. During my testimony at my husband's detention hearings I was all of a sudden told I needed an attorney by magistrate Vitunac. Soon after my husband received an unsolicted plea offer signed by Mr. McAdams which included a direct threat to indict me if my husband would not plea.

20.) My testimony at trial would have proven beyond any doubt that my husband had no involvement with his codefendants after January 1993. My testimony would have also clearly outlined my husband's efforts and success in funding some deals. To be exact my testimony would of outlined Dominck Maggio's activities in Europe, with my husband where my husband did in fact fund one deal until the point Agent Stidger and Mike Beasley interfered with the deal. My husband did infact fund over $800,000.00 to this group.

Further Affiant sayeth not.

[signature]
Tanya Faller

In the state of Kentucky, county of Russell sworn to and subscribed before me this 7 day of June, 2002

My Commission expires on 10-9-02 [signature]

STATE OF KENTUCKY
COUNTY OF RUSSELL

PLAINTIFF'S EXHIBIT 14

# AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths Sarah Faller after being sworn states on oath the following:

1.) I am a citizen of the United States and am 15 years old.
2.) I fully understand what "truth" is defined as.
3.) I am the daughter of James Faller.
4.) I was subpoenaed to testify on December 7, 2001 concerning threats made directly to my family and I by FBI agent Alan Stidger and Mike Beasley in case 97-6063.
5.) I traveled to West Palm Beach Florida fully expecting to testify to matters concerning the threats.
6.) Upon our arrival at the courthouse I became aware of agent Stidger's presence and witnessed first hand the following events.
7.) A Mr. Joseph Gergle, who became known to me returned from the courtroom where the hearing was taking place.
8.) Mr. Gergle was literally hysterical from the events that apparently happened in the courtroom. Mr. Gergle was shaking and crying. He stated many times in a hysterical manner "they're (the govt.) going to get me." He also stated "he would not want to go through what Barbara has." (Meaning Barbara Murray). Mr. Gergle also said," "I cannot afford a lawyer" he also said "he could not afford to be arrested because he was taking care of his sick mother and would do whatever it took to keep from being arrested." There is no question that Mr. Gergle was terrified because he told all of us "the Government threatened him in the court room and the judge let it go on."
9.) During our stay in West Palm Beach I was asleep in our hotel room with my sister Mary Dixon. Mary and I received two calls where the person on the phone was heavy breathing and then hung up. My sister and I called our parents who were away shopping.
10.) Both before and after the calls strange persons followed us in and around the hotel.
11.) On one occasion I saw agent Stidger at the hotel reading the paper.
12.) My father contacted the US Marshall's office and the West Palm Beach police came to the hotel. The police moved us to another room under another name.
13.) I was particularly afraid because the reason I was there to testify was because agent Stidger had called our home in Augusta and directly threatened me while my father was in jail. He would identify himself and say, "This is special agent Stidger. Put your mother on the phone" when I replied "she's not here" He would then say "you better cooperate." he

 SF

would then say "you better watch out because I know where your sister (meaning my little sister Jaime) is right now and I know where she gets off the bus."

14.) On a few occasions I would see agent Stidger in our neighborhood. He would be parked in the neighborhood.

15.) Because my mother was terrified from the threats she endured in the courthouse by agent Stidger she would not testify out of fear.

16.) My mother was terrified as a result of the threats imposed on her both before and at the hearings held in West Palm Beach Florida.

17.) I am aware that my mother and sister have been directly threatened and followed many times by agent Stidger and Mike Beasley.

Further Affiant sayeth not.

Sarah Faller [signature]
Sarah Faller

In the state of Kentucky, county of Russell sworn to and subscribed before me this 7 day of June, 2002

My Commission expires on 10-9-02 [signature]

PLAINTIFF'S EXHIBIT 15

STATE OF FLORIDA
COUNTY OF Hillsborough

AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths James Gardner after being sworn states on oath the following:

1.) I am a citizen of the United States and am over 18 years old.
2.) I was formally a detective for James Faller to investigate Richard Adam.
3.) I was previously in law enforcement for over 10 years investigating all types of crimes including financial crimes.
4.) I was subpoenaed to testify on December 7, 2001 concerning threats made directly to me by FBI agent Alan Stidger and Mike Beasley in case 97-6063.
5.) As a result of my lawenforcement experience FBI agent Luebke asked me if given what I know about Faller, this case and my back ground, would I have indicted James Faller. I told him "No, I would not". His response was "you are probably right."
6.) I have also been interviewed by the FBI in Tampa Florida concerning the threats and misconduct of agent Stidger. At that time the Tampa FBI offered me protection for my family and I from agent Stidger.
7.) I traveled to West Palm Beach Florida fully expecting to testify to matters concerning the threats and activities of agent Stidger.
8.) Upon our arrival at the courthouse I became aware of agent Stidger's presence and witnessed first hand the following events.
9.) A Mr. Joseph Gergle, who became known to me returned from the courtroom where the hearing was taking place.
10.) Mr. Gergle was literally hysterical from the events that apparently happened in the courtroom. Mr. Gergle was shaking and crying. He was also hyperventilating.
11.) He stated many times in a hysterical manner "they're (the govt.) going to get me." He also stated "he would not want to go through what Barbara has." (Meaning Barbara Murray). Mr. Gergle also said," "I cannot afford a lawyer" he also said "he could not afford to be arrested because he was taking care of his sick mother and would do whatever it took to keep from being arrested." There is no question that Mr. Gergle was terrified because he told all of us "the Government threatened him in the court room and the judge let it go on." He would repeat over and over "I haven't done anything, how could they do this to me and how could a judge allow this in a courtroom?" Mr. Gergle stated "he would do anything they (the govt.) want to get out of this no matter what it took."
12.) On two occasions I saw agent Stidger at the Sheraton hotel where the Faller's were staying.
13.) I was aware Mr. Faller had contacted the US Marshall's office and the West Palm Beach police came to the hotel. The police moved them to another room under another name.

14.) During my attendance at the courthouse in West Palm Beach, Mrs. Faller informed me that Agent Stidger stated to Tanya Faller "you will not screw with me." She was very fearful of agent Stidger.
15.) It has been my observation that Tanya Faller and her children have genuinely been in fear for their lives from agent Stidger and a man they describe as "Beasley".
16.) During my stay in West Palm Beach for this hearing I was present when Sarah Faller and Mary Dixon became very afraid when they saw agent Stidger.
17.) On several occasions the Faller's daughters stated to me that agent Stidger had previously threatened them.

Further Affiant sayeth not.

James Gardner

In the state of Florida county of Hillsborough sworn to and subscribed before me this 7 day of June, 2002

My Commission expires on 1-28-03

Diane M. LeDuc

OFFICIAL NOTARY SEAL
DIANE M LEDUC
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD015828
MY COMMISSION EXP. JAN. 28,2003

TO: Faller FROM: Susan DATE: / / PAGES INCLUDING THIS PAGE:
FAX #: 270-866-5141 FAX #: PHONE #:

STATE OF GEORGIA
COUNTY OF COLUMBIA

AFFIDAVIT

Personally appeared before the undersigned-attesting officer authorized by law to administer oaths Anne Nielsen after being sworn states on oath the following:

1.) I am a citizen of the United States and am over 18 years old.
2.) I was formerly a neighbor of James and Tanya Faller.
3.) I was asked to testify on December 7, 2001 concerning threats made directly to the Faller family by FBI agent Alan Stidger and Mike Beasley in case 97-6063.
4.) I traveled to West Palm Beach Florida fully expecting to testify to matters concerning the threats and activities of agent Stidger.
5.) Upon our arrival at the courthouse I became aware of agent Stidger's presence and witnessed first hand the following events.
6.) A Mr. Joseph Gergle, who became known to me returned from the courtroom where the hearing was taking place.
7.) Mr. Gergle was literally hysterical from the events that apparently happened in the courtroom. Mr. Gergle was shaking and crying. He was also hyperventilating.
8.) He stated many times in a hysterical manner "they're (the govt.) going to get me." He also stated "he would not want to go through what Barbara has." (Meaning Barbara Murray). Mr. Gergle also said," "I cannot afford a lawyer" he also said "he could not afford to be arrested because he was taking care of his sick mother and would do whatever it took to keep from being arrested." There is no question that Mr. Gergle was terrified because he told all of us "the Government threatened him in the court room and the judge let it go on." He would repeat over and over "I haven't done anything, how could they do this to me and how could a judge allow this in a courtroom?"
9.) At this point, Beverly Candlish was also present in the witness room and became quite agitated and visibly upset after hearing Mr. Gergle describe his courtroom experience. She stated that she could not afford to have the same thing happen to her. Without knowing why, I observed that Ms. Candlish was no longer present at the trial.
10.) During our stay in West Palm Beach I was away for a visit with family on the weekend between hearings. I received a call from James and Tanya Faller who were terrified because they were receiving harassing calls in the hotel room. I immediately returned to West Palm Beach out of fear for my safety as well as theirs.
11.) The Fallers and I were followed during our stay by persons not known to us.
12.) Mr. Faller had contacted the US Marshall's office and the West Palm

Beach police came to the hotel. The police moved us to other rooms under another name.

13.) On more than one occasion I saw agent Stidger parked in our neighborhood. He would be sitting in a position where he could easily observe the Faller's house.

14.) During my attendance at the courthouse in West Palm Beach, I was walking into the witness room and looked to my left. There I observed Agent Stidger at the end of the hallway speaking to Tanya Faller. I went in to the witness room and a couple of minutes later Tanya Faller entered the witness room. Her appearance was pale and fearful. She was very nervous and she wanted to immediately talk to their attorneys. She then told me Agent Stidger stated to her "you will not screw with me." She could not believe that he had said that to her in the courthouse. She got horribly upset and very disconcerted that she was being put through this again.

15.) I have previously been present when Tanya Faller was pregnant and received life threatening calls from agent Stidger. I observed Tanya Faller turn sheet white as a result of the phone calls. When I asked her why she was afraid she explained she just received another call from agent Stidger who had threatened her life. She told me she had been receiving these calls for some time.

16.) Because of the threats sustained by Tanya Faller at the West Palm Beach court house she became terrified to the point where she remained in the hotel room and would not return to the courthouse because she was afraid of what agent Stidger might try to do her. She had to have her in-laws come to stay with her.

17.) It has been my observation that Tanya Faller and her children have been in fear for their lives from agent Stidger and a man they call Beasley.

18.) It is also my concern that since being called to testify in this case, I too am now fearful. I have been followed and have had questions asked of neighbors about me. I am honestly afraid!

Further Affiant sayeth not.

Anne T. Nielsen

Anne Nielsen

In the state of Georgia, County of Columbia sworn to and subscribed before me this 10 day of June, 2002 Michelle W. Clark

My Commission expires on Feb. 20, 2005

PLAINTIFF'S EXHIBIT
2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Criminal Case No. 97-6063-Cr-Ryskamp

JAMES FALLER,

Petitioner,

vs.

UNITED STATES OF AMERICA,

Respondent.
_______________________________/

**AFFIDAVIT OF MARIA ELENA PEREZ, ESQ**

STATE OF FLORIDA )

COUNTY OF MIAMI-DADE )

Before me the undersigned appeared MARIA ELENA PEREZ, who, being duly sworn under oath states as follows:

1. That I am an attorney licensed to practice law in the State of Florida, whose Florida Bar number is 0487910.

2. I represented Richard Adams in July, 2003 in the above-styled criminal case.

3. In preparing the case, I went to the United States Attorneys Office in West Palm Beach in late July, 2003 for a discovery conference. I was accompanied by my assistant, Lourdes Gonzalez. I was let into a conference room with many boxes of documents. There was so much material to review that I went back in August, 2003. While looking through boxes of documents that were bate stamped, I discovered in a corner of the same room

boxes of material that were not bate stamped. The search through these documents took close to eight hours and I ordered Legal Imprints to copy these boxes of over 3,000 documents.

4. Many of these documents from the boxes in the corner of the room were from Germany and Luxembourg. They contained bank records, interviews of government witnesses, including 302s and the prosecution notes, much of which I later learned had never been disclosed to the defense.

FURTHER AFFIANT SAYETH NAUGHT.

Maria Elena Perez, Esq.

DL# P620-545-72-662-7

Sworn and subscribed to me this 18th day of April, 2006. Affiant is personally known to me and did take an oath..

Notary Public, State of Florida

My commission expires:

Jodi Jackson
My Commission DD235441
Expires July 29, 2007

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 97-6063-CR-Ryskamp**

United States of America
Plaintiff

Vs.

Richard Adam, Et, al.,
Defendants

_________________________________/

**AFFIDAVIT**

The affiant, J. Vincent Aprile II, after having been duly sworn, states as follows:

1.) I am a licensed attorney in the State of Kentucky, Bar No. 01570, who was admitted in 1968 and am in good standing with the Kentucky Supreme Court;

2.) My business address is Lynch, Cox, Gilman, and Mahan P.S.C., 500 West Jefferson Street, Suite 2100, Louisville, Kentucky 40202, 502.589.4215;

3.) I represent James and Tanya Faller in matters in the State of Kentucky that are related to matters involved in Mr. Faller's case in the above-captioned action;

4.) In the investigation of the two indictments brought against Mr. Faller in Kentucky, both in Russell County, the one that was dismissed and the one that is pending, there is evidence indicating that former Assistant United States Attorney James McAdams and others working with him were involved in the instigation of these charges;

5.) As to the first indictment, Mr. Faller was indicted for cutting down trees, even though subsequently expert evidence established no trees had been cut on the property for over two decades;

6.) The complaining witness, Samuel J. Tarter, was indicted by the Russell County Grand Jury for perjury, false swearing and criminal trespassing for the acts which Mr. Tarter committed against Mr. Faller and his family, including his testimony before the grand jury that produced the first indictment against Mr. Faller;

7.) Mr. Tarter, a resident of Kentucky, has indicated that he was in contact with James McAdams;

8.) Shortly after the first indictment against Mr. Faller was dismissed in exchange for Mr. Faller's required agreement to the dismissal of charges against Mr. Tarter, the local district attorney, Commonwealth's Attorney Larry Rogers, caused Mr. Faller and his wife to be indicted for theft of services and theft by deception.

9.) Evidence indicates that these new charges are based on perjured testimony presented to the grand jury including, for example, one witness claiming that she was owed $30,000.00 for two weeks pay, even though, during the time that this woman claimed to work for the Fallers, she was in a mental institution in Oklahoma;

10.) A special prosecutor, a Commonwealth's Attorney from another county, has been appointed to investigate the charges that Mr. Faller has made, including perjury charges against witnesses who testified before the grand jury that indicted Mr. Faller and his wife (the pending indictment), as well as charges of theft of thousands of dollars of assets from the Fallers and the forgery of Mr. Faller's name on a $50,000 surety bond (a civil court found Mr. Faller's signature to be a forgery). The alleged perpetrators of the non-perjury charges include a number of the witnesses who testified before the grand jury that produced the second

indictment against Mr. Faller;

11.) There is evidence that the Russell County Commonwealth's Attorney, who assisted the grand juries that twice indicted Mr. Faller, has been in contact with James McAdams on matters relating to these state charges brought against Mr. Faller.

FURTHER THE AFFIANT SAYETH NAUGHT.

J. Vincent Aprile II

STATE OF KENTUCKY )
) SS
COUNTY OF JEFFERSON )

SUBSCRIBED AND SWORN TO before me by J. Vincent Aprile II, this 20 day of April, 2006.

Notary Public-Ky at Large
My Commission expires: 3/8/08

EXHIBIT 8

# AFFIDAVIT

* * * * * * *

Comes now the undersigned Affiant, upon the request of Mr. James Faller, and with the Affiant first having been duly sworn, does draft and state under oath the following:

1. My name is Matthew B. DeHart. I am a practicing attorney in Jamestown, Kentucky.

2. That some time in the morning hours of September 23, 2003 I was notified that Mr. James Faller was in the Russell County Jail. I was further aware that the grand jury was meeting that morning.

3. That throughout the morning hours and in to the afternoon I visited Mr. Faller at the Russell County Jail a number of times.

4. I recall that it was also a regular Russell Circuit Court rule day.

5. During that morning and throughout the day I was attempting to secure Mr. Faller's release from custody, and was attempting to get a bond amount set.

6. I was also in contact during that day with Ms. Tanya Faller, as she was also charged, but not incarcerated. We were primarily concerned that we would not be able to secure the release of both Mr. and Mrs. Faller due to financial issues.

7. At some point during the day a number of indictments were returned against Mr. and Ms. Faller.

8. Throughout the day I recall a number of conversations with the Commonwealth Attorney, Larry Rogers. I do not recall the specific times that these conversations took place.

9. I recall a specific conversation I had with Mr. Rogers which occurred outside of the courtroom in the rear corridor beside the stairs leading down to the jail exit. During this conversation I recall Mr. Rogers' insinuations that Mr. Faller's alleged actions were a course of conduct and he would therefore demand any bond be in the amount Mr. Faller allegedly owed as to these charges. During this conversation Mr. Rogers stated either or both, that he had already talked to a federal prosecutor in Florida, or that he had a message waiting on him from a federal prosecutor in Florida, as Mr. McAdams I believe.

10. After the indictments were returned, Mr. Rogers and I agreed upon bond amounts for Mr. and Ms. Faller. As Mr. Faller was already incarcerated, I dealt with Ms. Faller in regard in to raising the bond monies. At approximately 4:25 p.m., as per Deputy David Cain's Uniform Citation, I presented Ms. Tanya Faller to the Russell County Sheriff's Office for the indictments to be served upon her. Deputy Cain served the indictments upon Ms. Faller, at which point we immediately posted bond in the Russell Circuit Clerk's Office. At that same time, I believe Mr. Faller's bond was posted. Deputy Cain and I then walked over to the Russell County Jail and Mr. James Faller was at 4:30 p.m. served with his indictments. At that point I left for the day, as Mr. Faller's bond had also been posted, though he had not yet been processed out of the Russell County Jail.

Further, Affiant sayeth naught.

MATTHEW B. DEHART, Affiant

STATE OF KENTUCKY

COUNTY OF RUSSELL

Subscribed and sworn to before me by MATTHEW B. DEHART, on this the 17th day of June, 2005.

NOTARY PUBLIC; State at Large
My Commission Expires: 12/08/07

Attachment 17

**SWORN ATTESTATION**

I Robert L. Bertram the undersigned, do hereby swear on oath as follows;

1.) I am a licensed attorney, actively practicing law in the state of Kentucky.

2.) I represent Tanya Faller in the matter of Tanya Faller vs. Rima David, et al., 06-CI-00225, Russell Circuit Court.

3.) During the Course of said representation the Attorney for the Defendant, Mary Hayes has informed the Court of numerous matters to try and discredit my client and her husband James Faller.

4.) In a recent pleading Ms. Hayes stated to the Court that she had recently spoken with James G. McAdams III and that Mr. McAdams had advised her that he continued to work with the Department of Justice.

5.) Approximately 4 to 5 years ago, I was contacted by Mr. McAdams who advised me that Mr. Faller was dangerous and may try to harm someone if cornered.

6.) Although I do not know what the conversations entailed, a lawyer who used space in my office had several conversations with Mr. McAdams.

[signature]

Robert L. Bertram

Subscribed and sworn to before me, a Notary Public, this the 12th day of June, 2007 by Robert L. Bertram.

[signature]

NOTARY PUBLIC, STATE AT LARGE
MY COMMISSION EXPIRES: 6-13-07

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

James S. Faller II

(b) County of Residence of First Listed Plaintiff Russell
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)

James S. Faller II
P. O. Box 2395
Russell Springs, Kentucky 42642

**DEFENDANTS** **07-80652**

United States Department of Justice, James G. McAdams III, Allen L. Stidger, Federal Bureau of Investigation, Alberto Gonzales,

County of Residence of First Listed Defendant Palm Beach
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**CIV-MARRA**

Attorneys (If Known)

**MAGISTRATE JUDGE JOHNSON**

(d) Check County Where Action Arose: ☐ MIAMI-DADE ☐ MONROE ☐ BROWARD ☑ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☑ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

W.P.B-07-80652-CV-MARRA-JOHNSON

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

2007 JUL 23

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☒ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed- (see VI below) ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):

a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☑ YES ☐ NO

JUDGE Kenneth L. Ryskamp   DOCKET NUMBER 97-CR-6063 and 1:06 CV 60554

**VII. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause **(Do not cite jurisdictional statutes unless diversity)**:

42 USC 1983, 42 USC 1985 conspiracy to deprive civil rights through various means

LENGTH OF TRIAL via 40 days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** 3,000,000,000.00

CHECK YES only if demanded in complaint: **JURY DEMAND:** ☑ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

SIGNATURE OF ATTORNEY OF RECORD

DATE July 13, 2007

**FOR OFFICE USE ONLY**

AMOUNT $350.00 RECEIPT # 963665 IFP

07/23/07